Megan Mae ADAMS, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–04–028–CR.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Dec. 8, 2005.

Oscar Rene Flores, Edinburg, for Appellant.

Amy Howell Alaniz, Asst. Dist. Atty., Theodore C. Hake, Asst. Crim. Dist. Atty., Edinburg, for Appellee.

Before Chief Justice VALDEZ and Justices CASTILLO and GARZA.

## OPINION

Opinion by Justice CASTILLO.

After the juvenile court waived and then transferred jurisdiction to the district court, appellant Megan Mae Adams, and co-defendants Frank Macias and Christopher Lozano were indicted for murder.[1] The trial court granted the State's motion for joinder of three co-defendants for trial. A jury convicted each of the three of murder and assessed punishment at a term of life imprisonment in the Texas Department of Criminal Justice—Institutional Division for Macias and Adams, and a term of fifteen years for Lozano. By six issues, Adams appeals the judgment.[2] We affirm.

## I. BACKGROUND

1. The indictment alleged that on or about March 5, 2003, Adams caused the death of Jan Barnum by strangling her with a ribbon. A person commits murder if she causes the death of an individual. See Tex. Pen.Code Ann. § 19.02 (Vernon 2003). The juvenile court waived and then transferred jurisdiction to the district court.

2. Adams raises six issues on appeal. In her first issue, Adams asserts that the trial court lacked jurisdiction to prosecute Adams, a juvenile, because the juvenile court did not comply with section 53.06(a) of the family code. In her second issue, Adams maintains that the juvenile court failed to admonish her pursuant to title 3 of the family code generally, thereby invalidating transfer to the criminal district court. Adams asserts this violation of her due process and due course of law rights mandates reversal. Adams also claims that the trial court abused its discretion in denying her motion for severance (third issue) and the resulting reduction of her peremptory challenges from ten to six because multiple defendants were tried together (fourth issue) resulted in prejudice. Adams asserts in her fifth issue that the evidence was legally insufficient to support a conviction for murder because the State failed to show that Adams encouraged, directed, aided, or attempted to aid in the commission of the murder. In her sixth and final issue on appeal, Adams asserts that the trial court erred in denying her motion to suppress evidence.

## A. The Strangulation of Jan Barnum [3]

On or about March 5, 2003, at approximately 5:00 p.m., Adams and co-defendants Macias and Lozano, juveniles, were detained by juvenile investigator Miguel Hernandez for criminal trespass at a vacant house near Adams' residence. After being released, the three put into motion plans to run away to Louisiana where Adams had relatives. They initially intended to travel by bus, but then decided to use Jan Barnum's car. Barnum was Adams' maternal grandmother.[4] Their plan was to wait for Barnum to fall asleep before taking the car. When it took too long for Barnum to fall asleep, a plan developed to kill her. As Macias waited in the bathroom, Adams led Barnum through the hall of the apartment they shared. Adams was present while Macias used a ribbon to strangle Barnum. At some point, Lozano entered the apartment and observed Macias strangling Barnum. Neither Adams nor Lozano took any action nor attempted to prevent or stop Macias from strangling Barnum. With Adams driving, the three fled in Barnum's car and drove first to a truck stop, then to the residence of J.R., Macia's girlfriend, and then to a convenience store.

Bernardo Aguilar, an employee of the convenience store, was working the night shift. He reported to police officer John Vargas, who was at the scene,[5] that three juveniles at the store looked nervous and suspicious. Aguilar indicated the juveniles had come into the store for gas and an atlas. Officer Vargas recognized the juveniles from earlier in the day and suspected they were again runaways. He called dispatch to report three possible runaways and requested that another officer be sent to the location. Officer Javier Gallegos was dispatched to the location and confirmed that all three juveniles had been reported as runaways. Officer Gallegos placed the juveniles in the patrol car to take them to their residences. Macias was released to his stepfather. Lozano was released to his aunt. Adams attempted to stay with Lozano; however, Lozano's aunt refused because Adams had not been staying with Lozano as Adams stated to Officer Gallegos.

Adams asked to be taken to the home of her "uncle," Andrew Narvaez, who informed officer Gallegos that Adams was staying with her grandmother and that he knew where her apartment was located.[6] Officer Gallegos followed Narvaez to Adams' grandmother's apartment. En route, Adams repeatedly insisted that she needed to speak with Narvaez privately, which Officer Gallegos permitted when they arrived at the apartments where Barnum lived. Adams whispered to Narvaez that an intruder had broken into the apartment and strangled Barnum. Narvaez then told this to Officer Gallegos who then requested an ambulance, a supervisor and backup. He obtained a key to the residence from a security guard on duty because the windows and doors were locked. Once inside the apartment, office Gallegos found Barnum's body facedown in a bed-

---

**3.** The State called numerous witnesses to testify about the crime scene, forensics, and juvenile proceedings leading up to the transfer proceedings, as well as the three co-defendants' oral and written statements.

**4.** Barnum and Adams moved into Barnum's apartment in January 2003; Adams having previously resided with her great-grandmother.

**5.** Officer Vargas was off duty, in a civilian automobile and at the drive-through window of the store when Aguilar told him about the juveniles. Aguilar's concern was that the time was after curfew, the juveniles were underage, and "nervous." Meanwhile, Barnum's car stalled at the convenience store.

**6.** Narvaez is not Adams' uncle.

room. It appeared that she had been strangled. When juvenile investigator Santiago Solis arrived at the scene, he found, among other things, four to five strands of brown hair about two inches long, grasped in Barnum's right hand.[7]

■ Officer Michael Mata was also dispatched and arrived at Barnum's apartment where he found Adams inside Officer Gallegos' patrol car. Mata read Adams her Miranda[8] warnings. Adams volunteered that an intruder strangled her grandmother. Officer Mata transported Adams to the police department. Adams was taken before the juvenile magistrate and then returned to the police station where she gave a statement to police. Macias and Lozano also appeared before the magistrate and gave statements regarding the events of that evening, up to and including Barnum's death. The three statements were admitted in evidence.

In his statement, Macias admitted he murdered Barnum but explained that he did so at Adams' request. Macias stated that Adams gave him the ribbon he used to kill Barnum. In her statement, Adams admitted she was present during the attack but stated that the decision to kill Barnum was solely Macias' decision. Lozano admitted in his statement that he walked in during the attack and although he told Macias to stop, he did nothing to attempt to stop Macias. He admitted that, prior to the attack, as the two waited for Adams outside the apartment, Macias told him that Adams wanted Macias to kill Barnum. Lozano did not believe Macias had the courage to kill Barnum and did nothing.

At trial, Macias testified in his defense. He admitted he killed Barnum. He testified that, while Lozano and he waited for Adams outside Barnum's apartment, Adams gave him a ribbon with an attached medal, to use in the assault. Macias removed the medal, threw it on the lawn, entered the apartment, and waited in the bathroom. Adams walked through the hall and Barnum followed her as the two argued. Macias sprung from the bathroom and, using both hands and the ribbon, strangled Barnum until "her hands stopped moving." He testified that, at one point, he momentarily stopped, but Adams threatened to call the police and accuse Macias of attempting to kill Adams if Macias did not finish what he started.

## B. Prior Confrontations Between Adams and Barnum

In addition to the evidence concerning the strangulation of Barnum, the record contains evidence of prior confrontations and ill will between Adams and Barnum. The testimony of J.R., Macias' girlfriend and Adams' friend, relates an earlier plan of Adams and J.R. to murder Barnum by putting cockroach poison and Nyquil in Barnum's drinking water. J.R. testified that, on February 28, 2003, she was present when Adams and Barnum argued and Adams said that she "hated [Barnum] and she wanted her to die." J.R. asked "Why not kill her?" and Adams agreed. Macias and Lozano were present in the apartment at the time.[9] Adams put the poison in Barnum's Sprite but did not give it to Barnum. At 3:00 a.m. the following morn-

---

7. Forensic testing showed that the hairs could not be excluded as Adams' head hair.

8. When an individual is taken into custody and subjected to questioning, the U.S. Constitution amendment V privilege against self-incrimination is jeopardized. To protect the privilege, procedural safeguards are required

called *"Miranda* warnings." *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. Evidence showed that Barnum disapproved of the presence of Macias and Lozano in the apartment, requesting that they leave. When

ing, Narvaez drove the four of them to a store where Adams stole Nyquil pills. At the apartment, Adams made holes in the pills with a needle and put the medicine in a glass of water that Adams told Barnum to drink. A.G., another friend of Adams corroborated the testimony of J.R.

The resident who lived in the apartment above Barnum's testified that he heard arguments every day between Adams and Barnum. On the night of the murder, he heard the two arguing again. The apartment complex manager testified she was aware of Barnum's problems with Adams.

## II. JURISDICTION

Adams' first two issues challenge the trial court's jurisdiction. She asserts: (1)

Adams insisted that they stay, Barnum left to her room.

10. Section 53.06 states:
 (a) The juvenile court shall direct issuance of a summons to:
 (1) the child named in the petition;
 (2) the child's parent, guardian, or custodian;
 (3) the child's guardian ad litem; and
 (4) any other person who appears to the court to be a proper or
 necessary party to the proceeding.
 (b) The summons must require the persons served to appear before the court at the time set to answer the allegations of the petition. A copy of the petition must accompany the summons.
 (c) The court may endorse on the summons an order directing the person having the physical custody or control of the child to bring the child to the hearing. A person who violates an order entered under this subsection may be proceeded against under Section 53.08 or 54.07 of this code.
 (d) If it appears from an affidavit filed or from sworn testimony before the court that immediate detention of the child is warranted under Section 53.02(b) of this code, the court may endorse on the summons an order that a law-enforcement officer shall serve the summons and shall immediately take the child into custody and bring him before the court.
 (e) A party, other than the child, may waive service of summons by written stipulation or by voluntary appearance at the hearing.

the State did not comply with summons requirements as mandated by section 53.06 of the family code, *see* Tex. Fam.Code Ann. § 53.06 (Vernon 2002); [10] and (2) the juvenile court did not provide the statutory admonition in section 54.03(b) of the family code, *see* Tex. Fam.Code Ann. § 54.03(b) (Vernon 2002), [11] thereby invalidating the transfer of jurisdiction to the criminal district court. [12]

### A. Issuance and Service of Summons

■ By her first issue, Adams essentially asserts that because of a defect in the issuance and service of summons on her, a juvenile, the juvenile court never acquired jurisdiction to transfer and, thus, the dis-

Tex. Fam.Code Ann. § 53.06 (Vernon 2002).

11. Section 54.03 states in pertinent part:
 (b) At the beginning of the adjudication hearing, the juvenile court judge shall explain to the child and his parent, guardian, or guardian ad litem:
 (1) the allegations made against the child;
 (2) the nature and possible consequences of the proceedings, including the law relating to the admissibility of the record of a juvenile court adjudication in a criminal proceeding;
 (3) the child's privilege against self-incrimination;
 (4) the child's right to trial and to confrontation of witnesses;
 (5) the child's right to representation by an attorney if he is not already represented; and
 (6) the child's right to trial by jury.
 Tex. Fam.Code Ann. § 54.03(b) (Vernon Supp.2004–05).

12. Section 54.02(a)(2)(B) of the family code provides that the juvenile court may transfer a child over the age of fifteen to district court, for prosecution, if (1) the child is alleged to have violated a penal law of the grade of felony, (2) so long as no adjudication hearing has been conducted concerning that offense, and (3) the requirements of sections 53.04 through section 53.07 are met. Tex. Fam.Code Ann. §§ 53.04–07, 54.02 (Vernon 2002).

trict court never acquired jurisdiction to try her for the transferred offense. Further, she adds, the criminal district court did not have jurisdiction because the juvenile court did not effect issuance or service of summons of the petition for transfer.[13]

█ The juvenile proceedings in this case were governed by family code section 54.02, which states, among other things, that (1) the petition and notice requirements of sections 53.04, 53.05, 53.06, and 53.07 of the family code must be satisfied, and (2) the summons must state that the purpose of the hearing is to consider discretionary transfer to criminal court. Tex. Fam.Code Ann. § 54.02(b) (Vernon Supp. 2004–05). Failure of the summons to comply with section 54.02(b) deprives the juvenile court of jurisdiction to consider discretionary transfer. *See Grayless v. State*, 567 S.W.2d 216, 219 (Tex.Crim.App.1978) (citing *Johnson v. State*, 551 S.W.2d 379 (Tex.Crim.App.1977); *In re D.W.M.*, 562 S.W.2d 851 (Tex.1978)). Absent a valid waiver of jurisdiction by the juvenile court, it does not have jurisdiction over the accused. Tex. Pen.Code Ann. § 8.07 (Vernon Supp.2004–05); *See Grayless*, 567 S.W.2d at 220. Thus, an order of the juvenile court waiving jurisdiction when it does not have jurisdiction is a nullity and deprives the district court of jurisdiction to try the accused for a criminal offense. *Id.* at 220; Tex. Pen.Code Ann. § 8.07 (Vernon Supp.2004–05).

█ Section 53.06 states in clear and unambiguous terms that summons shall be issued to the child, among other persons. Tex. Fam.Code Ann. § 53.06 (Vernon 2002). In the absence of a summons on the juvenile, the juvenile court does not acquire jurisdiction to consider discretionary transfer. *In re D.W.M.*, 562 S.W.2d 851, 853 (Tex.1978). This court has held that the service requirements of the family code are satisfied where a summons and petition are served on the juvenile. *In re K.P.S.*, 840 S.W.2d 706, 709 (Tex.App.-Corpus Christi 1992, no pet.).

The appellate record contains (1) an Order to Issue Summons for Child for Discretionary Transfer to Criminal Court, (2) the summons, (3) the petition for discretionary transfer to criminal court, (4) the return of summons, and (5) the precept to serve.[14]

█ The petition and summons were filed on May 22, 2003, in the 92nd district juvenile court, and included a request for a hearing for the purpose of considering waiver of jurisdiction under section 54.02(a) of the family code.[15] Tex. Fam. Code Ann. § 54.02(a) (Vernon Supp.2004–05). Proof of service of the summons, effected on Adams on May 20, 2003, complies with the unequivocal mandate of section 53.06 of the family code regarding issuance and service of the summons. There is no indication in the record of any earlier pleading in the juvenile or district

13. The juvenile court cannot acquire jurisdiction over the juvenile in the absence of personal service of the summons on the child. *Johnson v. State*, 551 S.W.2d 379, 381 (Tex. Crim.App.1977).

14. The summons identifies the persons served. The precept to serve identifies the persons to be served and shows notice to appear before the juvenile court, at the date and time set, to answer the allegations of the petition. The precept to serve states that the Petition for Discretionary Transfer to Criminal Court "is attached hereto and made a part of" same. The executed return shows that Adams was personally served with summons on May 20, 2003, at 8:26 a.m. Proof of service is also shown as to her guardian ad litem and great-grandparents.

15. As the State notes, the summons was in the trial court record in juvenile court cause number J–191–03–A, *In re Megan Mae Adams, A Child.*

court. Because the record establishes proof of service of the summons and petition, we conclude that the service requirements of section 53.06(a) of the family code were satisfied. *Id* at § 53.06(a) (Vernon Supp.2004–05); *K.P.S.*, 840 S.W.2d at 709. The juvenile court had jurisdiction to enter the transfer order. Accordingly, the district court had jurisdiction. We overrule Adams' first issue.

### B. Statutory Admonishment in Juvenile Court

■ By her second issue, Adams asserts that the trial court lacked jurisdiction to prosecute because the juvenile court lacked jurisdiction, having failed to provide the statutory admonishment required under section 54.03 of the family code prior to transfer. *See* Tex. Fam.Code Ann. § 54.03(b) (Vernon Supp.2004–05).[16] The State responds that Adams did not preserve error [17] and, even so, the complained-of admonishment applies only to an adjudication hearing and not to a transfer proceeding.[18]

■ An adjudication hearing incorporates many of the features of a criminal trial, including the right to a jury trial, the right to remain silent, and the right to exclude evidence inadmissible under the rules governing criminal proceedings.[19] *Id.* A proceeding to declare a juvenile a delinquent, including an adjudication hearing under section 54.03 of the family code

and a proceeding to waive jurisdiction and to certify a juvenile as an adult for criminal prosecution under section 54.02, are separate and distinct proceedings. *See Grayless,* 567 S.W.2d at 219; Tex. Fam. Code Ann. §§ 54.02, 54.03. Statutory admonishment is required in an adjudication of a juvenile; it is not required in a transfer or other preliminary proceeding. Tex. Fam.Code Ann. § 54.03(b).

The parties acknowledge and the record reflects that Adams' case did not involve an adjudication hearing in juvenile court. The requirement for statutory admonition never arose, and Adams did not object to the failure to admonish. Rather, the juvenile court transferred jurisdiction to district court so that Adams could be tried as an adult. *See Id* § 54.02 (Vernon 2002). The transfer petition was the first and only juvenile proceeding.

Adams also asserts that her due process and due course of law rights were violated by the juvenile court's failure to admonish. However, Adams did not present her complaint below.

■ To preserve a complaint for appellate review, a party must present a timely request, objection, or motion to the trial court stating the specific grounds for the desired ruling if the specific grounds were not apparent from the context. Tex. R.App. P. 33.1(a); *Blue v. State,* 41 S.W.3d 129, 131 (Tex.Crim.App.2000) (en banc);

---

**16.** See note 11.

**17.** Section 54.03(i) specifically requires an objection to the lack of judicial admonition in order to preserve the issue for appellate or collateral review. Tex. Fam.Code Ann. § 54.03 (Vernon Supp.2004–05); *In re C.O.S.,* 988 S.W.2d 760, 763 (Tex.1999).

**18.** We must address even an alternative argument in an appellee's reply. *Kombudo v. State,* 171 S.W.3d 888 (Tex.Crim.App., 2005) (per curiam).

**19.** The Legislature provided different rules for different stages of a juvenile proceeding. *In re J.P.,* 136 S.W.3d 629, 630 (Tex.2004); *see* Tex. Fam.Code Ann. § 54.03(a) (Vernon Supp.2004–05). Section 54.03(a) of the family code states that a "child may be found to have engaged in delinquent conduct or conduct indicating need for supervision only after an adjudication hearing conducted in accordance with the provisions of this section." *Id.* at § 54.03(a) (Vernon Supp.2004–05).

*see Keeter v. State,* 175 S.W.3d 756 (Tex. Crim.App., 2005) (citing *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App.1992) (en banc) ("All the party must do to avoid the forfeiture of a complaint on appeal is to let the trial court know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the trial court to understand him at a time when the trial court is in a proper position to do something about it.")); *Haley v. State,* 173 S.W.3d 510 (Tex.Crim.App., 2005).[20] An accused may waive even constitutional rights. *Saldano v. State,* 70 S.W.3d 873, 887 (Tex.Crim.App.2002) (en banc); *Jenkins v. State,* 912 S.W.2d 793, 815 (Tex. Crim.App.1995) (op. on reh'g) (en banc). "Some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system." *Blue,* 41 S.W.3d at 131("A principle [sic] characteristic of these rights is that they cannot be forfeited. That is to say, they are not extinguished by inaction alone."). Instead, an accused must expressly relinquish a fundamental right. *Id.*

■ We have already concluded that the juvenile and district courts had jurisdiction in the respective proceedings before them. Because the requirement for statutory admonishment never arose, Adams' jurisdictional challenge fails. We further conclude that the failure of a juvenile court to properly admonish a juvenile pursuant to section 54.03(b) of the family code must be presented to the juvenile court in order to preserve the complaint

for appeal. *In re E. F.,* 986 S.W.2d 806, 810 (Tex.App.-Austin 1999, pet. denied). Such failure must be specifically assigned and is not fundamental error that can be raised for the first time on appeal. *Id.* Adams did not preserve error for appellate review. *Haley,* 173 S.W.3d at 516. We overrule Adams' second issue.

## III. SEVERANCE ON SEPARATE, CO–DEFENDANT INDICTMENTS

Adams challenges the trial court's denial of her motion to sever trials on two grounds. By her third issue, Adams maintains that the trial court abused its discretion by refusing to grant the motion to sever her trial from that of her co-defendants. Adams asserts a joint trial was clearly prejudicial because of (1) antagonistic defenses, and (2) varying degrees of guilt. By her fourth issue, Adams states that she was denied peremptory strikes to which she would otherwise have been entitled had she been tried alone. The State responds that Adams has not shown "clear prejudice," mutually exclusive defenses, or harm.

### A. Scope and Standard of Review

Texas Code of Criminal Procedure article 36.09 mandates that the court order a severance upon a timely motion and upon introduction of evidence which establishes either (1) that there is a previous admissible conviction against one defendant, or (2) that a joint trial would be prejudicial to any defendant. Tex.Code Crim. Proc.

---

**20.** Preservation of error for appellate review under Texas Rule of Appellate Procedure 33 requires that the record demonstrate (1) the complaining party made a timely and specific request, objection, or motion; and (2) the trial judge either ruled on the request, objection, or motion, or he refused to rule and the complaining party objected to that refusal. *Haley v. State,* 173 S.W.3d 510, 515 (Tex.

Crim.App., 2005) (citations omitted). An objection must be timely, specific, pursued to an adverse ruling, and must be made each time inadmissible evidence is offered. *Id.* Two exceptions apply to the requirement of subsequent objections: counsel may obtain a running objection or request a hearing outside the presence of the jury. *Id.*

Ann. art. 36.09 (Vernon 1981);[21] *Aguilar v. State*, 26 S.W.3d 901, 903 (Tex.Crim. App.2000) (en banc); *Aguilar v. State*, 39 S.W.3d 700, 702 (Tex.App.-Corpus Christi 2001, pet. ref'd); *Davila v. State*, 4 S.W.3d 844, 846–47 (Tex.App.-Eastland 1999, no pet.); *Silva v. State*, 933 S.W.2d 715, 718–19 (Tex.App.-San Antonio 1996, no pet.).

■■■ We review the denial of a motion to sever trials for an abuse of discretion. *Mendoza v. State*, 61 S.W.3d 498, 501–02 (Tex.App.-San Antonio 2001), *aff'd on other grounds*, 88 S.W.3d 236 (Tex.Crim.App. 2002). An abuse of discretion exists when the trial court's ruling is outside the zone of reasonable disagreement regarding the law applicable to an issue. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim.App.1991) (op. on reh'g) (en banc).

■■■ The trial court has considerable discretion in deciding whether a joint trial would be so prejudicial to a particular defendant as to warrant a severance unless a joint trial would prejudice a co-defendant as a matter of law. *See Aguilar*, 39 S.W.3d at 702; *Simon v. State*, 743 S.W.2d 318, 322 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd); *see Garza v. State*, 622 S.W.2d 85, 91 (Tex.Crim.App.1981); *Aguilar*, 39 S.W.3d at 702. When an accused is not entitled to a severance as a matter of right, the denial of same by the trial court constitutes an abuse of discretion "only when the movant satisfies the 'heavy burden' of showing clear prejudice." *Patterson v. State*, 783 S.W.2d 268, 270 (Tex.

App.-Houston [14th Dist.] 1989, pet. ref'd); *see also Silva*, 933 S.W.2d at 718. A showing of clear prejudice based on an allegation that the co-defendants' defenses are inconsistent is apparently established if the co-defendants' respective positions are mutually exclusive to the extent that "the jury in order to believe the core of one defense must necessarily disbelieve the core of the other." *Aguilar*, 39 S.W.3d at 702 (citing *Goode v. State*, 740 S.W.2d 453, 455 n. 2 (Tex.Crim.App.1987) (citations omitted).

■■■ A motion to sever on the grounds of unfair prejudice under article 36.09 is "timely" if made at the first opportunity or as soon as the grounds for prejudice become or should have become apparent, thus providing the trial court an opportunity to rule on the potentially prejudicial evidence at the time it is introduced. *Aguilar*, 26 S.W.3d at 901. The mere allegation that prejudice will result is not evidence of, or a sufficient showing of, prejudice under article 36.09, particularly when the severance is discretionary with the trial judge. *Patterson*, 783 S.W.2d at 270. If the motion to sever is not supported by evidence, its denial is not an abuse of discretion. *See Salazar v. State*, 127 S.W.3d 355, 356 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd), *Silva*, 933 S.W.2d at 718–19.

### B. The Record

The State filed a motion for joinder of defendants for trial, asserting that the

---

**21.** Article 36.09 states:

Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and

evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

TEX. CODE CRIM. PROC. ANN. art. 36.09 (Vernon 1981).

murder charges against the three defendants involved the same victim and arose out of the same criminal activity. The State further asserted that there were no admissible convictions that would be introduced in evidence or any other evidence that would make a joint trial of all three defendants prejudicial to any one defendant. Adams filed a motion to sever, stating that a joint trial would deprive her of a separate and fair trial on grounds of inconsistent defenses and varying degrees of guilt between the three defendants. Further, Adams asserted that a joint trial would deprive her of effective assistance of counsel, due process of law, and due course of law under the federal and state constitutions.

At the pretrial hearing, Adams requested that the trial court review the reporter's record of the transfer hearing as evidence in support of her motion. Lozano's counsel argued, in part, that the testimony of Adams or Macias at trial could be exculpatory as to Lozano, and, accordingly, a decision on whether to grant separate trials would be premature.[22] Macias did not oppose the State's motion for joinder. The trial court postponed a ruling on the competing motions until it had the opportunity to review the record of the transfer proceeding. On August 15, 2003, the trial court signed an order granting the State's motion for joinder. The order recites a finding that "having the defendants tried by the same jury will not substantially prejudice their rights." On August 19, 2003, during a pretrial hearing, Adams reurged the motion to sever on grounds that she would be denied (1) peremptory strikes and (2) the opportunity to confront witnesses as guaranteed by the federal and state constitutions if the extrajudicial confessions of the other non-testifying defendants were admitted in evidence. Lozano joined in Adams' argument. Macias did not oppose a joint trial. The trial court denied the motion for severance.

## C. Analysis

Adams does not assert that the same evidence would not have been admitted in a separate trial.[23] Rather, Adams limits her argument to clear prejudice based on antagonistic defenses of three defendants tried together (issue three) and denial of peremptory strikes (issue four).

### 1. Antagonistic Defenses

By her third issue, Adams argues that the respective defenses were mutually exclusive to the extent that, to believe the core of one defense, the jury must necessarily disbelieve the core of the other. The State counters that the jury could have believed the core of all three statements.

At trial, without objection, the extrajudicial statements of Adams, Macias, and Lozano were admitted in evidence.[24] The three statements reflect that Adams, Loza-

---

**22.** Adams' counsel argued, "I echo some of [counsel's] concerns. But again, at this point it is based more on speculation than actual facts because I don't know what the other two Defendants intend to do during the course of trial. So, to that extent we would oppose the severance." Lozano's counsel reserved the right to file a motion for severance should evidence arise to support it.

**23.** Adams also does not assert that the extrajudicial statements were noncompliant with

Texas Family Code section 51.095(a), providing that "the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if" certain procedural requirements are followed. *See* Tex. Fam.Code Ann. § 51.095(a) (Vernon 2002).

**24.** The statements were admitted in the transfer proceeding.

no, and Macias were present at some point when Macias strangled Barnum. The crux of Adams' statement and defense was that Macias acted alone and she was neither a principal nor a party. Lozano's statement and defense was that he was neither a principal nor a party. Macias' statement and defense was that Adams and Lozano were parties to the offense because the plan was Adams' and Lozano encouraged him. Even assuming Adams did not direct Macias to kill Barnum, Adams did nothing to stop Macias' entry into the apartment;[25] rather, she argued with Barnum while aware Macias was inside the apartment. Further, Adams did nothing to stop the attack while present in the apartment and in the hall where the attack occurred. She remained in the apartment and fled only after Barnum appeared to be lifeless. Then, in the police unit while en route from the convenience store to her apartment, Adams concealed the murder from law enforcement and, with the murder about to be discovered, told the officers of an intruder who attacked Barnum and whom she tried to stop. None of the extrajudicial statements show that Macias or Lozano requested Adams to conceal the identity of the assailant, Macias.

In his extrajudicial statement, Lozano admitted he knew of talk of murder but he did not believe Macias would do it. He observed the attack and did not act to stop it. At Adams' direction, he retrieved the victim's purse. He fled the scene in the victim's car, with the person he observed strangle Barnum. Lozano concealed the murder weapon. Macias admitted committing the murder both in his extrajudicial statement and at trial. His defense, presumably in mitigation of punishment, centered on Adams' ordering him to kill Barnum and providing the murder weapon.

Lozano's extrajudicial statement corroborated Macias' statement that the murder plan was Adams'. Lozano's and Adams' statements corroborate that Lozano entered the apartment and told Macias to stop strangling Barnum. At trial, Macias admitted he lied in his extrajudicial statement twice: (1) when he stated that Lozano told him to "go for it" in response to Macias' disclosing Adams' request that Macias kill Barnum and (2) when Macias stated that Lozano smiled when he saw Macias strangling Barnum. While Macias inculpated Lozano by his statement to police, at trial he provided exculpatory, or otherwise mitigating evidence, that Lozano told him to stop. However, Macias gave Lozano the murder weapon, implicating Lozano.

■■■ The evidence does not support Adams' claim of mutually inconsistent defenses.[26] *Aguilar*, 39 S.W.3d at 703. Adams must show that the co-defendants' respective positions were mutually exclusive to the extent that "the jury, in order to believe the core of one defense must necessarily disbelieve the core of the other." *Id.* at 702. The core of Adams' defense was that Macias acted on his own accord and Adams did not provide the

---

25. The jury heard that the apartment showed no visible signs of forced entry. The jury also heard from a neighbor that Barnum and Adams were outside the apartment, later determined by law enforcement to be not long before the murder. Further, consistent in the three extrajudicial statements is the fact that Adams knew Macias and Lozano were outside the apartment waiting for Adams.

26. Although Adams argued that there were varying degrees of guilt between all the defendants, proof that the defendants have different levels of culpability is not enough to establish that separate trials are required. *Morales v. State*, 466 S.W.2d 293, 296 (Tex.Crim.App. 1970); *Davila v. State*, 4 S.W.3d 844, 847 (Tex.App.-Eastland 1999, no pet.).

murder weapon. However, she facilitated Macias' access into the apartment. The core of Lozano's defense was that he was essentially an unwilling bystander, both as recipient of Macias' information of Adams' plan and as observer of the murder. However, after the murder, he retrieved the victim's purse, fled with the victim's assailant and Adams, and concealed the murder weapon. The core of Macias' defense was, presumably, in pre-conviction mitigation of punishment. Macias never denied he murdered Barnum. Adams and Lozano did nothing to physically stop Macias from committing the offense before or as it occurred, and willingly fled with him from the crime scene in the victim's car, with the victim's purse and money.

On this record, we cannot conclude that the trial court abused its discretion in denying the motion to sever. Inculpatory statements in Adams' extrajudicial statement, the crux of the evidence offered in support of the motion to sever, place her voluntarily at the crime scene during the murder and behind the wheel of the escape vehicle with the victim's assailant and money. The same statement to police establishes that Adams voluntarily concealed the identity of the assailant and the crime at the outset, while Macias and Lozano disclosed Macias as the assailant. We conclude that Adams' participation as a party was apparent from the record before the trial court and, thus, the trial court, in denying the motion to sever, could have reasonably concluded that the defenses were not mutually exclusive.

Further, the trial record does not show that Adams raised objections on grounds of prejudice, that became or should have become apparent, at the time prejudicial evidence, if any, was introduced. Thus, Adams has not shown she would have proceeded differently if the trial court had severed her case. *See Davila,* 4 S.W.3d at 847. We further conclude that Adams has not shown clear prejudice. We overrule Adams' third issue.

### 2. Denial of Peremptory Strikes

By her fourth issue, Adams maintains she was reversibly denied peremptory strikes because of the joinder of defendants for trial. The State responds that the argument is without merit. We review jury selection and peremptory strike questions for an abuse of discretion by the trial court. *Lopez v. Foremost Paving, Inc.* 709 S.W.2d 643, 644 (Tex. 1986).

A peremptory challenge is made to a juror without assigning any reason therefor. Tex.Code Crim. Proc.Ann. art. 35.14 (Vernon Supp.2004–04). Ordinarily, in non-capital felony cases the State and the defendant are entitled to ten peremptory challenges. See Tex.Code Crim. Proc. Ann. art. 35.15(b) (Vernon Supp.2004–05). If two or more defendants are tried together, each defendant shall be entitled to six peremptory challenges and the State to six for each defendant. *Id.*

Before voir dire, Adams objected that a joint trial would allow the State eighteen peremptory strikes "while we are in fact only going to be getting six. That puts them at an advantage." At the conclusion of voir dire, the trial court instructed counsel to exercise six strikes and "one beyond" for the alternate juror.

In construing a statute, we look to the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not possibly have intended. Tex. Gov't Code Ann. § 311.011(a) (Vernon 2004); *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App.1991); *Lane v. State,* 933 S.W.2d 504, 515 n. 12 (Tex.Crim.App. 1996). Viewed under normal rules of statutory construction, the trial court's order

is consistent with the mandatory language in article 35.15(b) of the code of criminal procedure. Accordingly, we cannot conclude that the trial court acted without reference to guiding rules or principles. *Montgomery*, 810 S.W.2d at 391. We conclude the trial court did not abuse its discretion. We overrule Adams' fourth issue.

## IV. MOTION TO SUPPRESS JUVENILE'S ORAL STATEMENTS

By her sixth issue, Adams maintains the trial court reversibly erred by denying her motion to suppress on two bases. First, Adams asserts that the trial court should have suppressed any statement she made or any evidence gathered at the time of her illegal detention because Officer Gallegos did not comply with section 52.02(a) of the family code. Tex. Fam.Code Ann. § 52.02(a) (Vernon Supp.2004–05). Section 52.02(a) of the family code governs the procedures for "taking a child into custody." [27] Adams maintains that, based on section 52.02, any decision as to whether further detention of the child was warranted should have been made by an authorized officer of the juvenile court and not law enforcement. [28] She argues that, because Officer Gallegos usurped a function vested only in an officer designated by the juvenile court, her statements were illegally obtained and thus inadmissible under article 38.23 of the code of criminal procedure. *See* Tex.Code Crim. Proc. Ann. art. 38.23. (Vernon Supp.2004–05).

Second, Adams asserts that, because Narvaez was an agent of Officer Gallegos, her statements to Narvaez, who subsequently repeated them to Gallegos, were illegally obtained and inadmissible. Without particulars, Adams further asserts that any "other evidence" was illegally obtained and should also have been suppressed.

---

27. Section 52.02(a) of the Texas Family Code provides the following options to a person taking a child into custody:

(1) release the child to a parent, guardian, custodian of the child, or other responsible adult upon that person's promise to bring the child before the juvenile court as requested by the court;
(2) bring the child before the office or official designated by the juvenile court if there is probable cause to believe that the child engaged in delinquent conduct or conduct indicating a need for supervision;
(3) bring the child to a detention facility designated by the juvenile court;
(4) bring the child to a secure detention facility as provided by Section 51.12(j);
(5) bring the child to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment; or
(6) dispose of the case under Section 52.03.
Tex. Fam.Code Ann. § 52.02(a) (Vernon Supp.2004–05). Because Adams was a juvenile at the time of her arrest, the provisions of the family code control issues involving the appellant's substantive rights. *Roquemore v.*

State, 60 S.W.3d 862, 866 (Tex.Crim.App. 2001) (citing *Comer v. State*, 776 S.W.2d 191, 196 (Tex.Crim.App.1989)(holding that issues involving the substantive rights of pre-transfer juveniles are governed by the family code)). Section 52.02(a) of the family code reads in relevant part: "A person taking a child into custody, without unnecessary delay and without first taking the child to any place other than a juvenile processing office designated under section 52.025 of this code, shall do one of the following [enumerated acts]." Tex. Fam.Code Ann. § 52.02(a) (Vernon Supp. 2004–05). This section does "not preclude the admission of a statement made by the child if: . . . the statement does not stem from custodial interrogation." Tex. Fam.Code Ann. § 51.095(b)(1) (Vernon 2002).

28. Adams directs us to sections 52.04 (governing referral to juvenile court), 53.01 (governing preliminary juvenile investigation and determinations), 53.02 (governing release from detention), and 54.01 (governing juvenile detention hearings) of the family code. Tex. Fam.Code Ann. §§ 52.04, 53.01, and 54.01 (Vernon Supp.2004–05); *id.* § 53.02 (Vernon 2002).

The State responds that (1) Adams preserved error only with respect to her oral statements to Narvaez and, even so, (2) Adams' statutory rights were not violated.

### A. Preservation of Error

We must initially address whether Adams preserved error. *Kombudo v. State,* 171 S.W.3d 888 (Tex.Crim.App., 2005) (en banc) (holding that a reviewing court must address an appellee's reply as to preservation of error and an alternative argument in an appellee's reply) (per curiam) (citations omitted). In short, Adams essentially argues that her oral statements (1) made at the time of her initial detention or custody at the convenience store to Officer Gallegos and (2) to her "uncle Andy" Narvaez "as an agent of Officer Gallegos" at the apartment complex should have been suppressed because Gallegos did not comply with section 52.02(a) of the family code. She sought suppression of all statements and evidence Officer Gallegos obtained because he was usurping the duties of a duly authorized juvenile officer.

 The trial court convened a pretrial evidentiary hearing on Adams' and Macias' separate motions to suppress. In her motion, Adams requested the trial court suppress evidence of any and all statements (whether oral, recorded, or written) taken from her by any law enforcement official or anyone acting on their behalf at any time following her initial arrest by any officer. She further requested the trial court suppress any and all evidence obtained in an "unlawful manner." However, at the suppression hearing, Adams testified that she was waiving her challenge as to suppression of her written statement. Later in the hearing, Adams' defense counsel argued as follows:

> Your Honor, I just wanted to clarify one more thing. There was an oral statement that was made allegedly by Ms. Adams to an individual who we are alleging at the time was acting as an agent of the State. That statement, oral statement, we are going to be urging our Motion to Suppress. The only waiver that we had was to the written statement.

> And also I would join with [Macias'] motion and with respect to the suppression of the arrest our Motion to Suppress Evidence covers that evidence that [the prosecutor] had talked about, that which was taken from Ms. Adams without a search warrant. And also the arrest which would fall under Chapter 14 of the Texas Code of Criminal Procedure.

Other than her oral statement to Narvaez, Adams neither directs us to the record nor addresses in her brief what evidence she sought to suppress. The record demonstrates that Macias' defense counsel argued suppression of evidence on grounds that section 52.02 of the family code was violated and there was no probable cause for the arrest. We conclude that Adams preserved error as to suppression of her oral statement to Narvaez.

 We agree with the State's position that Adams has not preserved error as to physical evidence admitted at trial. *Kombudo,* 171 S.W.3d at 889; *Haley v. State,* 173 S.W.3d at 515 (Tex.Crim.App., 2005)("preservation of error is a systemic requirement that must be reviewed by the courts of appeals regardless of whether the issue is raised by the parties") (citations omitted). However, as the following record excerpt demonstrates, Adams did not object when the complained-of evidence was adduced through similar testimony from another police officer who was

at the crime scene.[29]

Officer Gallegos testified as to Adams' request to speak with Narvaez upon arrival at the apartment. On the prosecutor's direct examination, Gallegos testified before the jury as follows:

Q: At that point when you get to the apartment does [Adams] say anything to you in the patrol car between Mr. Narvaez['s] house and the apartments?

A. That she wants to talk to [Narvaez], she has something to tell him and I said why don't you tell me and she said, I want to talk to [Narvaez].

Q. What happens when you—where do you pull into the apartments?

A. We pull into the east side of the apartment complex, where the apartment is right next to the parking lot of Palm Street.

Q. And where does Andy Narvaez pull up to?

A. He pulls in—as soon as he pulls into the apartment complex he parks in the first parking space and I park right behind him.

Q. What happens next?

A. [Adams] said I want to talk to [Narvaez]. I want to tell him something. I said, okay, fine. I called [Narvaez] over and then I said, [Narvaez], will you come over here, [Adams] wants to tell you something real bad. And he says, okay. And so I just stood there right by the driver's side door and, well, I said, whisper in his ear. And he opened the door for her and she reaches out. And then he had this worried look like he was going to go to the apartment. And I stopped him, and I said, You need to tell

me what she said. And he—and he said that [Adams] told him that someone broke into the apartment and strangled her grandmother. . . .

Q. Where did [Adams] remain?

A. I had her get back in the patrol car and wait for another officer to standby and while she's in the car, I didn't want to leave her by herself. . . . She kept on repeating someone broke in and strangled her grandmother. .

Similarly, Officer Michael Mata testified that, when he arrived at the apartment complex, he observed Adams inside a police unit shouting and screaming. He did not question her. Adams told him that her grandmother was by herself and Adams feared that "she might have been killed or something." In response, he read her *Miranda* warnings but denied asking her questions. Adams told him that somebody had gone into the apartment and began to strangle her grandmother, adding that she "just tried getting him off and she couldn't do anything about it." Adams "blurted out that her grandmother was dead," and she "had no one else." Mata further testified that Adams said she wanted the subject who killed her grandmother in front of her so that she could kill him, stating she would "stuff paper down his throat and kill him with her bare hands."

At trial, Narvaez testified he knew Barnum because they attended the same church. When Officer Gallegos asked to leave Adams with Narvaez, Narvaez responded that he needed to contact Barnum first because Barnum had previously requested Narvaez contact her regarding Adams. Regarding the events that oc-

---

**29.** When a trial court overrules a suppression motion before trial, the accused need not object during trial to the same evidence to preserve error on appeal. *Wilson v. State,* 857 S.W.2d 90, 93 (Tex.App.-Corpus Christi 1993, pet. denied) (citing *Moraguez v. State,* 701 S.W.2d 902, 904 (Tex.Crim.App.1986)). However, the accused waives any error caused by admission of the evidence, despite the pretrial ruling, by affirmatively asserting during trial "no objection" to admission of the evidence. *Moraguez,* 701 S.W.2d at 904.

curred at the crime scene, Narvaez testified that Officer Gallegos told him Adams could not get out of the police unit because she was under arrest. Narvaez could not, however, recall what Adams told him at the scene because of the effects of medication he had previously taken that night.

A proper objection is one that is specific and timely. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex.Crim.App.2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim.App.2003). Further, with two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered. *Martinez*, 98 S.W.3d at 193. Two exceptions exist where counsel either (1) obtains a running objection, or (2) requests a hearing outside the presence of the jury. *Id.* Therefore, while Adams preserved error as to the statements to Narvaez, she did not preserve error as to all similar evidence of statements she made to Officer Mata at the scene. *Id.*

Even assuming error was preserved, we consider the State's alternate theory in response to Adams' sixth issue presented. *Kombudo*, 171 S.W.3d at 889. The State maintains that the trial court properly denied the motion to suppress on grounds that she has not shown improper police conduct.

### B. Motion to Suppress Standard of Review

We uphold a trial court's ruling on a suppression motion if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996) (en banc); *Perales v. State*, 117 S.W.3d 434, 438 (Tex. App.-Corpus Christi 2003, pet. ref'd). This

is true even if the decision is correct for reasons different from those espoused by the trial court. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). For the following reasons, we conclude that, even if Adams preserved error as to her argument on appeal, the trial court did not abuse its discretion in denying the motion to suppress on grounds that her statutory rights were not violated, as the State asserts in its reply.

### C. The Record

The parties do not dispute that Adams was detained, together with Macias and Lozano, at the convenience store on suspicion that they were runaways because they had a runaway incident earlier in the day and because of their statements to the convenience store employee. Off-duty police investigator John Vargas testified that he was at the drive-through at a convenience store at about 11:00 to 11:15 on the night in question. He recognized Adams from a runaway incident earlier that day. The convenience store employee related. his concerns regarding the juveniles traveling to Louisiana to Officer Vargas. Vargas radioed for assistance and Officer Gallegos was dispatched to the scene. Vargas testified he asked the juveniles if they were runaways. One of the males responded, "Yeah, again," but Vargas could not identify which one of them answered. According to his report, the three said, "Yeah again." Meanwhile, Vargas observed in plain view in the back of the car clothes and a hamster in a cage,[30] indicating to him that the three were running away. Vargas testified that the vehicle was registered to Barnum. Vargas further testified that Adams, Macias, and

---

30. Evidence at trial showed that, prior to leaving the apartment, Adams told Lozano to go to Barnum's bedroom and retrieve Bar-

num's purse. He complied. She then asked him to retrieve her pet hamster from her bedroom. Again, Lozano complied.

Lozano were put in Officer Gallegos' unit so that they would not run away. Vargas testified that he told Gallegos, "they probably killed the grandmother." Gallegos responded that "you never know."

Gallegos testified that he observed Adams sitting on the driver's side of the vehicle. He observed Macias attempt to enter a pickup truck but the driver waved Macias off and drove away. While Gallegos spoke with Vargas, the three juveniles were in the store looking in his direction. Gallegos entered the store and asked what they were doing and for their identification. They had none. Initially, Adams was non-cooperative with identifying information. Concerned that they might flee, he asked them to step in his unit and left the door open. He confirmed that Macias and Lozano were reported as runaways and there was no report as to Adams. Aware that the juveniles' vehicle was stalled, Gallegos asked Adams for the keys so that he could move the car from the pumps. Adams complied. When he moved the car, he observed a backpack and clothes in plain view. He opined that the juveniles were "going somewhere." Gallegos testified that the three were not handcuffed and the sole purpose for the detention was to release them to a parent or guardian.

Later, after securing identifying information and making numerous telephone calls to the juveniles' respective residences without answer, Gallegos released Macias to his stepfather at his home and then left Lozano with his aunt. Adams requested and attempted to remain with Lozano, indicating to Gallegos that she was staying with Lozano. Lozano's aunt refused to allow Adams to stay. Attempting to take Adams home, Gallegos asked her address. Adams responded that her grandmother was not home because she was visiting a friend. When Gallegos sought another family resource, Adams requested that Gallegos take her to her "uncle Andy" Narvaez's house. Gallegos complied. En route, Adams requested to speak privately with Narvaez, and Gallegos agreed. Gallegos told Narvaez that Adams said her grandmother was with a friend. Narvaez said he would get dressed so they could check. Narvaez drove past Gallegos' unit. Adams again said she wanted to talk to Narvaez.

When they reached the apartment complex, Adams spoke privately with Narvaez. Gallegos testified that Narvaez looked worried. Gallegos told Narvaez "to speak," and Narvaez said that Adams "told him that someone broke into the apartment and strangled her grandmother." Gallegos opined the situation was an emergency. He told Adams "to get back in the car." Adams said aloud that someone broke in. Gallegos testified that Adams "kept saying" that someone broke in and strangled her grandmother. At one point, Adams began "hyperventilating" and medical attention was attempted at the scene, which she refused, requesting that medical personnel take care of her grandmother. Gallegos testified that Adams said someone broke into the apartment. However, Gallegos observed that the door was locked. A security guard for the apartment complex opened the apartment. The apartment showed no signs of forced entry. Following a trail of blood in the hallway of the apartment, Gallegos found Barnum's body behind a closed door in one of two bedrooms. Gallegos sought assistance "to go recover the two juveniles" he had "dropped off." As reasons for his police conduct, Gallegos testified that (1) he responded to a dispatch that three juveniles were at a convenience store past curfew, (2) they indicated they were planning to go to Louisiana, (3) they had clothes in the car and a hamster indicating they were "going somewhere," (4) the vehi-

cle stalled at a convenience store and they were without transportation after curfew, (5) the vehicle belonged to Barnum, (6) Adams had no driver's license, (8) he observed Macias attempt to board another vehicle although rejected by the driver, (9) the juveniles were earlier that same day runaways and he confirmed that Macias and Lozano were again reported as runaways, and (10) Gallegos ultimately "found a body that no one was telling him what had happened until he got there." After he found Barnum's body, Gallegos determined that the three were "going to leave for a reason."

At the conclusion of the hearing, Adams' defense counsel further argued that Adams sought to suppress "the statements, specifically and only the statement that was given allegedly by Ms. Adams to Mr. Narvaez ... and then Officer Gallegos." Further, "[t]here were shoes that were taken from her.... We'll address those whenever she attempts to introduce those." Defense counsel adopted Macias' suppression arguments and requested suppression of the evidence on grounds that law enforcement did not comply with section 52.02 of the family code.[31] Without stating the grounds, the trial court denied the motion to suppress.

Adams asserts that Officer Gallegos "wholly failed to comply" with section 52.02(a) of the family code by usurping a function vested solely in an officer designated by the juvenile court. She asserts that her statements, if illegally taken, could not have been admitted against her in her criminal trial under article 38.23 of the code of criminal procedure. She argues that Officer Gallegos' sole reason for noncompliance with section 52.02 of the

family code was to obtain her statements and evidence.

### D. Police Conduct

#### 1. Reasonable Suspicion

▮▮▮▮ An accused seeking to suppress evidence on the basis of illegal police conduct bears the burden of proof to rebut a presumption of proper police conduct. *Moreno v. State,* 124 S.W.3d 339, 344 (Tex. App.-Corpus Christi 2003, no pet.) (citing *McGee v. State,* 105 S.W.3d 609, 613 (Tex. Crim.App.2003)). Reasonable suspicion exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity. *Garcia,* 43 S.W.3d 527, 530 (Tex.Crim.App.2001); *Woods v. State,* 956 S.W.2d 33, 35 (Tex. Crim.App.1997) (en banc). The articulated facts that support a temporary detention must be taken as a whole, and the reasonable suspicion formed must be based on the totality of the circumstances. *Woods,* 956 S.W.2d at 38. Where the initial detention is unlawful, any evidence seized subsequent to such a detention is inadmissible. *Gurrola v. State,* 877 S.W.2d 300, 302 (Tex. Crim.App.1994) (en banc). The ultimate standard set forth in the Fourth Amendment is reasonableness. *Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

▮▮▮▮ Absent a warrant, the State had the burden at the suppression hearing to show by a preponderance of the evidence that the officer had at least a reasonable suspicion that Adams either had committed an offense or was about to do so before

---

**31.** Defense counsel requested the trial court to suppress "any evidence that the State is going to be attempting to introduce at the time of trial, any evidence that was taken from Ms. Adams, and specifically the statement that was made allegedly by her to Mr. Narvaez and then to Officer Gallegos."

he detained her. *See McGee,* 105 S.W.3d at 613; *see also Russell,* 717 S.W.2d at 9–10. Giving almost total deference to the trial court in determining the historical facts, we believe those facts to be that the officer (1) observed Adams violating curfew, without operative transportation, and (2) had a reasonable suspicion that some activity out of the ordinary was occurring or had occurred that was related to a crime. This is because: (a) the juveniles were heading to Louisiana; (b) they appeared to be and admitted they were runaways; (c) the three had earlier that day been detained as runaways and released; (d) Macias and Lozano were once more reported as runaways; and (e) Adams was unlicensed to drive and seated behind the wheel of a vehicle registered to Barnum. We conclude that the evidence demonstrates that the officer had reasonable suspicion to briefly detain Adams.

### 2. Probable Cause

■■■ A child may be taken into custody if there is probable cause to believe that she has engaged in (1) conduct that violated a penal law of this state or a penal ordinance of any political subdivision of this state, or (2) conduct indicating a need for supervision. Tex. Fam.Code Ann. § 52.01(a)(3) (Vernon 2004). We conclude that the officer had probable cause to believe that Adams violated curfew and engaged in conduct indicating a need for supervision as an admitted runaway with an out-of-state destination, having been in runaway detention earlier the same day, while accompanied by two reported runaways. *See* Tex. Fam.Code Ann. § 51.03(b)(3) (Vernon Supp.2004–05).

The question then becomes whether these facts, when viewed de novo, are sufficient to establish a violation of the law. *See Morrison,* 71 S.W.3d at 828;citing *Terry v. Ohio,* 392 U.S. 1, 21–22, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Woods v. State,* 956 S.W.2d 33, 35 (Tex.Crim.App. 1997); *Roy v. State,* 55 S.W.3d 153, 157 (Tex.App.-Corpus Christi 2001), *pet. dism'd, improvidently granted,* 90 S.W.3d 720 (Tex.Crim.App.2002). We conclude that the officer provided sufficient objective facts to demonstrate that Adams was engaged in conduct indicating a need for supervision. We further conclude that the officer adduced specific articulable facts to support the right to investigate and, armed with these facts, the officer had probable cause and was authorized to detain Adams. *See McGee,* 105 S.W.3d at 614; *Stull v. State,* 772 S.W.2d 449, 451 (Tex.Crim.App. 1989) (en banc) ("The test for probable cause is [w]hether at that moment the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person] had committed or was committing an offense."). The officer's custodial detention was, therefore, proper.[32]

---

**32.** A taking of a child into custody is not an arrest except for purposes of determining the legal validity of the search and seizure itself. See Tex. Fam.Code Ann. § 52.01(b) (Vernon Supp.2004–05). Section 51.095 of the family code governs the admissibility of a child's statement. Tex. Fam.Code Ann. § 51.095 (Vernon 2002). Section 51.095 does not preclude the admission of a child's statement if the statement does not stem from interrogation of the child while in the custody of an officer. Tex. Fam.Code Ann. § 51.095(b), (d) (Vernon 2002). The family code contemplates that once a law enforcement officer has found cause initially to take a child into custody and makes the decision to refer her to the intake officer or other designated authority, a law enforcement officer relinquishes ultimate control over the investigative function of the case. See Tex. Fam.Code Ann. §§ 52.02(a),52.04(a), and 54.02(d) (Vernon 2002); *Comer v. State,* 776 S.W.2d 191, 196 (Tex.Crim.App.1989). The Legislature intended that the officer designated by the juvenile

### 3. Ilegal Detention

■ After initially detaining Adams, the officer asked for her name, address and other pertinent information concerning her guardian/parent in order to deliver her to a location consistent with section 52.02 of the family code. *See* Tex. Fam. Code Ann. § 52.02(a) (Vernon 2002). Adams refused to cooperate at first but eventually gave the address of her "uncle" Andy Narvaez. Upon arriving at the residence of Andy Narvaez, Adams insisted on speaking with Narvaez alone.

■ Adams' statements to Narvaez were not the result of custodial interrogation.[33] *Wilkerson v. State*, 173 S.W.3d 521 (Tex.Crim.App., 2005) (citations omitted) (addressing alleged state agent conduct in the context of written statements). Adams requested to speak to Narvaez, not the police officer. Narvaez disclosed the information regarding Barnum to Officer Gallegos. While Gallegos acted on the information provided, evidence showed that Adams, unsolicited, repeated the same or similar statements. No right or privilege was violated by the officer's asking Narvaez what Adams had told him.[34]

■ Adams asserts that Narvaez was an agent of Officer Gallegos and Gallegos illegally obtained her oral statement to Narvaez. However, there are two types of "state agents": all those who are employed by any state agency are, by definition, "state agents," but only those who are working for or on behalf of police are law enforcement "state agents." *Wilkerson,* 173 S.W.3d at 524 (holding that CPS worker was not "in tandem" with police officers when interviewing the defendant).

The record demonstrates that Adams offered information regarding the whereabouts of the victim when she finally did speak with Narvaez upon arriving at the apartment complex. There is no evidence in the record to suggest that Narvaez was an agent of the officer as Adams suggests, or that Narvaez or Officer Gallegos initiated any questioning of Adams regarding the whereabouts of her grandmother prior to her oral statement to Narvaez. Rather, Adams, unsolicited, offered the information regarding Barnum first upon arriving at Narvaez's residence and, subsequently, upon arriving at the crime scene.

The record does not present the scenario where the police employ an informant to deliberately elicit incriminating statements from a defendant in custody, solely for the purpose of helping the police gather evidence against the defendant. *Escamilla v. State,* 143 S.W.3d 814, 824 (Tex.Crim.App. 2004) (citing *State v. Hernandez,* 842 S.W.2d 306, 312–16 (Tex.App.-San Antonio 1992, pet. ref'd), (discussing how non-law

court make the initial decision whether to subject a child to custodial interrogation. *Id.*

33. "Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Wilkerson v. State,* 173 S.W.3d 521, 526 (Tex.Crim.App.2005) (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602).

34. We observe that, after Narvaez told Officer Gallegos what Adams relayed regarding Barnum, the officer's decision to detain Adams was based on a superceding reason involving an offense against Barnum including victim-

ization and absconding with her vehicle. It seems the clear intent of the statutory scheme of the family code as a whole is that from this point on, the decision as to whether further detention is called for is to be made, not by law enforcement personnel, but by "the intake or other authorized officer of the court; see Tex. Fam.Code Ann. 53.02 (Vernon 2002); *see also"* 52.04 & 53.01 (Vernon 2002), with investigative aid of law enforcement officers when requested, *see* § 52.04(b), or by the juvenile court itself, see Tex. Fam.Code Ann. § 54.01 (Vernon 2002); *Comer,* 776 S.W.2d at 194.

enforcement personnel can become state agents for Sixth Amendment purposes). Officer Gallegos did not ask Narvaez to act as a state agent nor convert an otherwise legal request of Narvaez to disclose Adams' information into an illegal one. *Id.* (citing *Hernandez,* 842 S.W.2d at 314, for the proposition that creation of an agency between law enforcement and non-law enforcement personnel depends upon the existence of an agreement between them at the time of the elicitation). Even if this were an offer by law enforcement to Narvaez to become a state agent, there is no evidence to support a finding that Narvaez accepted the offer. *See id.*

On this record, we cannot conclude that Narvaez was acting as a state agent when Adams spoke with him. *Id.*

### 4. No Causal Connection

By her motion to suppress evidence obtained in violation of the law under article 38.23 of the code of criminal procedure, Adams had the burden to produce evidence demonstrating the causal connection between a violation of section 52.02(a) of the family code and the complained of statements. *See Pham v. State,* 175 S.W.3d 767 (Tex.Crim.App., 2005)(designated for publication) (requiring a causal connection between a violation of section 52.02(b) and the complained-of statements). The record does not demonstrate nor does Adams direct us to evidence in the record that establishes a causal connection between a section 52.02(a) violation and the complained of statements. *Id.* The burden to produce evidence never shifted to the State to disprove Adams' evidence or to bring an attenuation of taint argument to demonstrate that the causal chain Adams asserted was in fact broken. *See id.*

### 5. Unnecessary Delay

Adams asserts that Officer Gallegos unnecessarily delayed complying within one of the statutorily enumerated actions in section 52.02 of the family code. Section 52.02 expressly authorized Gallegos to release the juveniles to, among others, a parent, guardian, or other responsible adult. Tex. Fam.Code Ann. § 52.02(a)(1) (Vernon 2002). As to Adams, the sole responsible adult she identified to Officer Gallegos was "uncle Andy," who, rather than accepting Adams, engaged Gallegos to confirm that Barnum was not home. More importantly, unknown to Gallegos, no runaway report was possible as to Adams because her guardian Barnum was murdered. Once more, Adams has not shown a causal connection between the complained of unnecessary delay and evidence she sought to suppress. *Pham,* 175 S.W.3d at 774.

### 6. Disposition

After reviewing the evidence in the light most favorable to the trial court's ruling and with appropriate deference, we conclude that the trial court's ruling on the motion to suppress is reasonably supported by the record and is correct on the alternate theories articulated above. *Kombudo,* 171 S.W.3d at 889; *Villarreal,* 935 S.W.2d at 138; *Perales,* 117 S.W.3d at 438. We overrule Adams' sixth issue.

### V. LEGAL SUFFICIENCY

By her fifth issue, Adams challenges the legal sufficiency of the evidence to prove that she encouraged, directed, aided, or attempted to aid in the commission of the murder. The State responds that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

### A. Standard of Review

 A legal-sufficiency challenge calls on us to review the relevant evidence in the light most favorable to the verdict, and then determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Escamilla*, 143 S.W.3d at 817 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *see also Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim.App.2003) (en banc); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000) (en banc). This standard is meant to give "full play to the [jury's] responsibility fairly" to "draw reasonable inferences from basic facts to ultimate facts." *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim.App.2003). We consider all the evidence that sustains the conviction, whether properly or improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim. App.2001) (citing *Garcia v. State*, 919 S.W.2d 370, 378 (Tex.Crim.App.1994) (en banc)). Similarly, we consider all the evidence that sustains the conviction, whether submitted by the prosecution or the defense, in determining the legal sufficiency of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000) (en banc); *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim.App.1993) (en banc). In this review, we are not to reevaluate the weight and credibility of the evidence, but rather, we act only to ensure that the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex.Crim.App.1993) (en banc).

### B. The Law Applicable to Legal Sufficiency Challenge

#### 1. Hypothetically Correct Jury Charge

 The legal sufficiency of the evidence is measured against the elements of the offense as defined by a hypothetically correct jury charge for the case. *Malik v.* *State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). A hypothetically correct charge is one that (1) accurately sets out the law, (2) is authorized by the indictment, (3) does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and (4) adequately describes the particular offense proof. *Malik*, 953 S.W.2d at 240; *Cano v. State*, 3 S.W.3d 99, 105 (Tex.App.-Corpus Christi 1999, pet. ref'd). This standard of legal sufficiency ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime, rather than a mere error in the jury charge submitted. *Malik*, at 240. We then determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Johnson*, 23 S.W.3d at 7.

 With sufficient evidence of Adams' participation in the planning and commission of Barnum's murder, the indictment supported a jury instruction on the law of parties without a specific parties allegation in the indictment. *See Goff v. State*, 931 S.W.2d 537, 544 n. 5 (Tex.Crim. App.1996). A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Tex. Pen. Code Ann. § 7.01 (Vernon 2003). A person is criminally responsible for an offense committed by another, if, with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (Vernon 2003). In determining whether an accused participated as a party in an offense, a fact finder may examine the events occurring before, during, and after the commission of the offense and rely on

actions of the accused that show an understanding and common design to commit the offense. *Hanson v. State*, 55 S.W.3d 681, 690 (Tex.App.-Austin 2001, pet. ref'd). Mere presence is not enough, but presence is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show the accused was a participant. *Edwards v. State*, 106 S.W.3d 833, 842 (Tex.App.-Dallas 2003, pet. ref'd) (citing *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex.Crim.App.1987)). Thus, conviction was authorized under the evidence in this case if a rational jury could find that Adams intentionally caused Barnum's death, either as a principal or as a party. *See* Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003); *see* also *Hanson*, 55 S.W.3d at 690.

### 2. The Elements of Murder–Penal Code Section 19.02(b)(1)

Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex.Crim.App.1994). We must decide whether a rational trier of fact could have found beyond a reasonable doubt that Adams intentionally or knowingly caused the death of Barnum, Tex. Pen.Code Ann. § 19.02(b)(1) (Vernon 2003), either as a principal or a party. A person acts intentionally, with respect to the nature of her conduct or as a result of her conduct, when it is her conscious objective or desire to engage in the conduct or cause the result. Tex. Pen.Code Ann § 6.03(a) (Vernon 2004). A person acts knowingly, or with knowledge, with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Adams' intent must be established by circumstantial evidence. *See Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App.1978). The jury may infer the requisite intent from Adams' conduct. *See Conner*, 67 S.W.3d at 197. Motive is a significant circumstance indicating guilt.

*Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim.App.2004). Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Id.*

### 3. Inferences of Guilt

In addition to the court's charge, we note that mental states may be inferred and proven from acts done, words spoken, and the surrounding circumstances. *See Ledesma v. State*, 677 S.W.2d 529, 531 (Tex.Crim.App.1984) (en banc). Intent, in particular, is often shown by acts done, words spoken, and conduct of the accused at the time of the offense. *Beltran v. State*, 593 S.W.2d 688 (Tex.Cr. App.1980); *see Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim.App.2001). Evidence of flight is admissible as a circumstance from which a jury may draw an inference of guilt. *Bigby v. State*, 892 S.W.2d 864, 883 (Tex.Crim.App.1994) (en banc). Proof of intent generally relies on circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App.1978).

### 4. Corroboration of Accomplice Testimony

Adams was charged under the law of parties. Accordingly, the jury could convict her if it found that she was "present at the commission of the offense and encouraged its commission by words or other agreement." *King v. State*, 29 S.W.3d 556, 564 (Tex.Crim.App.2000) (en banc); *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App.1996) (en banc).

An accomplice is a person who participates in an offense before, during, or after its commission to the extent that the person can be charged with the offense or with a lesser offense. *Herron v. State*, 86 S.W.3d 621, 631 (Tex.Crim.App.2002) (citing *Blake v. State*, 971 S.W.2d 451, 454–

55 (Tex.Crim.App.1998)). A prosecution witness indicted for the same offense as the accused is an accomplice as a matter of law. *Id.* (citing *Ex parte Zepeda,* 819 S.W.2d 874, 876 (Tex.Crim.App.1991)). As an accomplice, Macias' testimony must be "corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 2004). We look for corroboration in all non-accomplice evidence, both prosecution and defense. *Cook,* 858 S.W.2d at 470. The required corroborative evidence may be either circumstantial or direct and need not directly link the accused to the crime. *Richardson v. State,* 879 S.W.2d 874, 880 (Tex.Crim. App.1993); *Reed v. State,* 744 S.W.2d 112, 126 (Tex.Crim.App.1988). Further, the corroborating evidence need not establish guilt beyond a reasonable doubt. *Id.*

Finally, "proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Brown v. State,* 672 S.W.2d 487, 488 (Tex.Crim.App.1984). Apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993). Evidence that an accused was in the company of the accomplice at or near the time or place of a crime is proper corroborating evidence to support a conviction. *Hernandez v. State,* 939 S.W.2d 173, 178 (Tex. Crim.App.1997).

### C. The Record

#### 1. Non–Accomplice Testimony

Adams' written statement, in which she relates the events leading to Barnum's murder, was admitted in evidence. When viewed in the light most favorable to the verdict, her statement demonstrates that, on March 5, 2003, Macias, Lozano, and Adams were detained for criminal trespass. The three were released but planned to run away to Louisiana that night. The plan was to meet at a vacant house near the apartment Adams shared with Barnum. At approximately 7:00 p.m., Adams was released to Barnum. At home, Barnum and Adams argued. Barnum ultimately fell asleep. Adams seized the opportunity to go to the vacant house. En route, she met Macias and Lozano. Macias inquired whether they could use Barnum's car to pick up his girlfriend, J.R. Meanwhile, back at the apartment, Barnum was awake. While Barnum was engaged in a telephone conversation, Adams retrieved the car keys from Barnum's purse without Barnum's knowledge or permission. After watching a television show, Adams moved to her bedroom. While outside Adams' bedroom window, Macias requested Adams hurry so they could leave. Adams wanted to wait until Barnum fell asleep. Macias responded, "Just kill her," and that "he would do it." Adams said, "No," and again asked that he "wait a while." When Barnum entered Adams' bedroom, Adams closed the blinds and explained she was looking out the window. In a second visit to Adams' bedroom, Barnum asked for the car keys. Adams told her she did not have them and offered to check the car to see if the keys were there. Adams "went out and pretended to go look for the [keys] in the car." Lozano approached her and told her that Macias was planning to kill Barnum. She asked Lozano if Macias "was serious." Lozano responded he thought so but that Macias "did not have the guts to do it. That none of [us] had the guts." Meanwhile, Barnum

exited the apartment, approaching Adams, but did not see Macias or Lozano. Adams pretended to look for the keys. The two returned to the apartment. Entering first, Adams walked past the bathroom toward Barnum's room and "saw [Macias] standing there." She signaled that he not do anything. Macias looked at her and "shook his head." When Barnum passed the bathroom, Macias "jumped out with a red, white and blue ribbon that was in the bathroom and started to "struggle" with Barnum. Adams ran out of the apartment and told Lozano. Lozano entered and told Macias to stop but he did not stop. Adams returned to gather her things. She sat down and Macias apologized. Adams told him to resuscitate Barnum. Macias responded that it was too late. Adams told Lozano to get Barnum's purse. Lozano complied and, on returning, told her that Barnum was "still breathing." Adams responded that they "leave because it was [too] hard for [her] to be there." They drove to J.R.'s residence but she was not there. They drove to a convenience store, where they bought a map. "The police arrived and pick[ed them] up."

Macias' girlfriend, J.R., testified that Adams previously planned to kill Barnum by poisoning her. J.R. testified that Adams previously said she wanted Barnum to die and made the statement in the presence of Macias and Lozano. Barnum's neighbor and the apartment manager both testified about the acrimony between Barnum and Adams. Officer Gallegos testified that he found Barnum's body after Adams disclosed to Narvaez that an intruder had attacked Barnum.

### 2. Accomplice Testimony and Evidence

Both Macias' and Lozano's written statements were admitted in evidence. Macias testified at trial. In the light most favorable to the verdict, the evidence shows that, when Macias spoke with Adams at her bedroom window, Adams said "it was better if we killed her. She told me how she wanted to kill her grandmother . . . that when her grandmother was [asleep], for [Lozano] to hold her by the legs while she [held] her arms down. She then told me that for me to suffocate her with something." Outside the apartment, Adams told Macias and Lozano that "we were going to kill her grandmother." They decided they would carry out Adams' plan. Adams entered the apartment and returned with a red, white, and blue ribbon to use to choke Barnum. Macias removed the medal from the ribbon and threw it on the lawn. Macias identified the medal investigators located at the crime scene as the medal he removed from the ribbon. While Adams was outside the apartment, Macias entered the apartment and hid in the bathroom. He heard Adams enter the apartment and heard Barnum ask her for the car keys. Adams walked past the restroom and told Barnum to check her room for the keys. As Barnum walked by, Adams choked her with the ribbon. Adams began to cry and ran to the living room. Lozano entered and briefly observed before walking toward Adams. At one point, Macias stopped the attack but continued after Adams threatened to call the police and report that Macias attacked her, too. After Barnum was motionless, Macias approached Adams and apologized. Adams told Lozano to retrieve Barnum's purse. Lozano complied. The three left in Barnum's car, with Adams driving.

### D. Disposition

The State presented evidence on both principal and party theories. The jury charge contained an instruction on both theories. Thus, the charge authorized the jury to find Adams guilty if she acted either as a party or as a principal to the offense. The jury rendered a general ver-

dict of guilty. Thus, if evidence of guilt is sufficient, we will affirm the verdict based on either theory. *See Rabbani v. State,* 847 S.W.2d 555, 558 (Tex.Crim.App.1992) (en banc); *Edwards,* 106 S.W.3d at 842; *see also Kitchens v. State,* 823 S.W.2d 256, 259 (Tex.Crim.App.1991).

The jury was authorized to convict Adams as a party to murder if the evidence showed that, if, with intent to promote or assist the commission of the offense, she solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense. Tex. Pen.Code Ann. § 7.02(a)(2) (Vernon 2005). In our sufficiency review, we are governed by the fact that the jury is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given to the testimony. *Earls v. State,* 707 S.W.2d 82, 85 (Tex.Crim.App.1986); Tex.Code Crim. Proc. Ann. art. 38.04 (Vernon 2004). The jury may believe or disbelieve all or any part of a witness's testimony, even though the witness's testimony has been contradicted. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986). Reconciliation of conflicts in the evidence is within the exclusive providence of the jury. *Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App. 1996). Evidence is not rendered insufficient when conflicting evidence is introduced. *Matchett v. State,* 941 S.W.2d 922, 936 (Tex.Crim.App.1996). If the evidence is sufficient to establish a defendant as either a principal or as a party, we must affirm the jury's verdict. *Edwards,* 106 S.W.3d at 842.

In this case, the jury was free to place whatever value it wished on Adams' statement. *See Wesbrook v. State,* 29 S.W.3d 103, 112 (Tex.2000) (en banc). The State presented testimony throughout the trial of witnesses who recalled the key events that occurred on March 5, 2003. Thus, the jury was free to disbelieve Adams' written statement, to reconcile any discrepancies in the testimony before it, and to judge the credibility of the witnesses including Macias. *See id.* at 111.

▮ Viewed in the light most favorable to the verdict, the evidence establishes that, on March 5, 2003, Adams was an eye witness to the murder of Barnum. Whether or not the plan to kill Barnum was Adams', she knew before the attack that Barnum was in danger. She provided the weapon or at least access to the weapon. She wanted Barnum dead before and on the date of the murder. While in possession of the car keys Barnum sought, Adams lured her through the hall adjoining the bathroom, where she knew the assailant waited, by suggesting Barnum look for the keys in the bedroom. She did not warn Barnum that the assailant was in the bathroom and that her life was in danger. When the attack ensued, Adams did nothing to prevent or stop it. Adams remained at the crime scene until Barnum was motionless. When told that Barnum was still breathing after the attack, Adams' response was to request Barnum's purse and voluntarily flee with the assailant. Next, Adams perpetuated a plan to conceal the crime by not disclosing to Officer Gallegos its occurrence or the assailant, although she had ample opportunity to do so. She concealed the identity of the assailant by misrepresenting that an intruder had attacked Barnum. Adams did not request assistance for Barnum until after the body was discovered.

Adams argues that the evidence fails to show that she encouraged, directed, aided or attempted to aid in the commission of the murder, which she maintains are all required elements of the offense as an accomplice. However, because Adams was charged under the law of parties, the jury could convict her if it found that she was "present at the commission of the offense

and encouraged its commission by words or other agreement." *King*, 29 S.W.3d at 564; *Ransom*, 920 S.W.2d at 302.

The record shows evidence of prior confrontations between Barnum and Adams as well as evidence of Adams' malcontent towards Barnum. Although Adams denied she strangled Barnum, evidence was produced to show that she was present at the time of the strangulation and did nothing to prevent or report it. Testimony demonstrates that Adams wanted Barnum dead and had on prior occasions put poison in Barnum's beverage and spoke of ways to kill her. By its verdict, the jury could have concluded beyond a reasonable doubt that Adams' death wish for Barnum materialized. Thus, the jury could have reasonably convicted Adams on the theory that she acted as a party by directing Macias to kill Barnum and aiding the murder by affording access to her. Tex. Pen.Code Ann. § 7.02(a)(2) (Vernon 2003). Further, the jury could reasonably infer Adams' guilt from the evidence that she fled the scene. *See Bigby*, 892 S.W.2d at 883.

Considering only the evidence in favor of the verdict, measured against a hypothetically correct jury charge on murder and the law of parties, we conclude: (1) the non-accomplice evidence furnished sufficient *corroboration* to sustain the conviction; (2) the evidence is legally sufficient to prove the essential elements of the offense of murder and to sustain the conviction on a party theory; and (3) any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *see also Johnson*, 23 S.W.3d at 7; *Sanders*, 119 S.W.3d at 820. We affirm the jury's verdict on the theory that Adams participated as a party to murder. *See* Tex. Pen.Code Ann. § 7.02(a)(2) (Vernon 2003); *see also Rabbani*, 847 S.W.2d at 558; *Kitchens*, 823

S.W.2d at 259; *Edwards*, 106 S.W.3d at 839. We overrule Adams' fifth issue.

## VI. CONCLUSION

Having overruled all of Adams' issues, we affirm the judgment of the trial court.