

# NUMBER 13-10-00138-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MELVIN JOHNSON III,                                                                  Appellant,

v.

THE STATE OF TEXAS,                                                                  Appellee.

## On appeal from the 130th District Court
## of Matagorda County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Benavides
### Memorandum Opinion by Chief Justice Valdez

Appellant, Melvin Johnson III, was convicted of possession of a controlled substance with intent to deliver. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112 (West 2010). Johnson received a punishment of sixty years' imprisonment and a $10,000

fine.[1]  By three issues, Johnson contends that: (1) the evidence was legally and factually insufficient to prove that he possessed a controlled substance with the intent to deliver it; and (2) the trial court abused its discretion in denying his motion to suppress evidence.  We affirm.

## I.  BACKGROUND[2]

Deputy Jeremy Brown of the Matagorda County Sheriff's Department testified that he conducted an investigation of Johnson using confidential informants.  Deputy Brown stated that during the course of his investigation, he identified 2928 Avenue B as Johnson's residence.  Deputy Brown observed Johnson "coming and going from the residence, sitting on the porch of the residence, [and] playing basketball with the child outside of the residence."[3]  Deputy Brown stated that during the course of a search, they usually look for items such as utility bills, a driver's license, or anything with identifying information inside the residence.  In this case, Deputy Brown testified that after acquiring a search warrant and searching 2928 Avenue B, the police found Johnson's driver's license and "some scattered paperwork in the back room with the name of Mr. Johnson on it."

---

[1] After finding Johnson guilty of the offense, the jury found that Johnson was a repeat offender. *See* TEX. PENAL CODE ANN. § 12.42 (West Supp. 2010).

[2] We note that the record reflects that Johnson "refused" to sign the trial court's certification of defendant's right of appeal.  Pursuant to rule 25.2(d), the trial court's certification "shall include notice that the defendant has been informed of his rights concerning an appeal, as well as any right to file a pro se petition for discretionary review."  *See* TEX. R. APP. P. 25.2(d).  Although the certification shows that Johnson refused to sign it, the record reflects that Johnson was notified of his rights under rule 25.2(d).  The record also contains a letter from Johnson's trial counsel stating that he explained those rights to Johnson.  Moreover, Johnson filed a timely notice of appeal, and both Johnson and the State have filed briefs in this case.  Therefore, we conclude that rule 25.2(d)'s requirements have been met in this case.

[3] Deputy Brown testified that based on his investigation, Johnson lived at the residence with "a younger child."

According to Deputy Brown, during the course of the investigation, the confidential informant purchased narcotics at Johnson's residence, and based on that information, Deputy Brown obtained a warrant to search Johnson's residence for narcotics. Deputy Brown testified that a SWAT team was used to effectuate the search warrant. Deputy Brown stated that the role of the SWAT team was to make entry into the house and to secure the residence from any potential threats. Deputy Brown assisted the SWAT team "with the control outside . . . the house." Deputy Brown testified that Johnson was present in the residence when entry was made and that no one else was present inside the residence. Johnson's son was outside playing basketball when the team made entry into the residence.

After the residence was secure, Deputy Brown executed the search warrant. According to Deputy Brown, the police found "some crack cocaine in the pocket of a jacket that was hanging on a door separating the living room from the bedroom."[4] Deputy Brown stated that the crack cocaine was "in the front pocket of the jacket where your hands go." Deputy Brown explained that there were two "rocks" of crack cocaine that were "loose," meaning that the pieces were not in any type of packaging. Deputy Brown documented that the crack cocaine weighed over one gram and less than four grams.

Deputy Brown testified that in cases of possession of crack cocaine, as opposed to cases of intent to deliver, the police usually find paraphernalia that is used to ingest the drugs, such as a crack pipe made of glass or a type of metal, brillo steel wool, and needles. Deputy Brown stated that he has also observed that in cases of possession

---

[4] Deputy Brown described the residence as as follows: "It was a wood frame, one bedroom. Basically, had a bedroom, bathroom, living room, and kitchen. That was basically it."

3

with intent to deliver, the police find larger amounts of the drug. Deputy Brown stated, "A user in my past—as a user, as soon as they get their hands on [the drug], they're going to ingest it as soon as they can. There's not going to be amounts of crack cocaine throughout the residence."

According to Deputy Brown, to make crack, powder cocaine is "cooked down into a rock form" which is usually "a round circle" called a "cookie" that reminded Deputy Brown of a sugar cookie. This cookie is then "broke[n] down into denominations to what it's going to be sold to the potential buyers." Deputy Brown stated that users will have small amounts of the drug while dealers have larger quantities and the amounts sold by drug dealers are "[a]nywhere from $5 to, you know [$]50, a hundred. You know around here, we see a lot of 10-and 20-dollar amounts sold." Deputy Brown testified that a 20-dollar amount of crack cocaine is "just a real small, small quantity, small rock for $20. Definitely less than a gram." Deputy Brown agreed that crack cocaine would not be sold in the amount found in the residence and that amount would have to be "broken down" into smaller pieces. According to Deputy Brown, the amount of crack cocaine found in the residence was valued "[b]etween [$]150 and $200 worth of crack." On cross-examination, Deputy Brown explained Johnson's intent to deliver the crack cocaine was shown by the amount of the drug that was found in his residence, among other things. Deputy Johnson stated, "That's not a quantity for a user. . . . I've never seen a crack pipe that you can put that type of—or that size of rock cocaine in."

According to Deputy Brown, they did not find any drug paraphernalia, such as brillo, a pipe, tubing, or needles. When asked if he found "anything that suggested to [him] that cocaine was being used in that residence," Deputy Brown replied, "no,

4

ma'am." Deputy Brown acknowledged that they did not find any money, packaging, or scales during the search. However, Deputy Brown explained that it is "very common" for crack to be sold without any packaging and usually crack cocaine in this amount is sold by size and not by weight. When asked if someone could sell crack cocaine without scales, cooking implements, or packaging, Deputy Brown responded, "Oh, yes, ma'am."

Sergeant James Nesbitt of the Matagorda County Sheriff's Narcotics Division testified that "mid[-]level dealer[s]" are not usually manufacturers of crack cocaine—they are not involved in "cooking the dope." Instead, the mid-level dealers purchase the crack cocaine from someone else who may have manufactured the drug. These manufacturers are also considered drug dealers. According to Sergeant Nesbitt, powder cocaine is cooked into "a circle of crack" called a "cookie." The cookie is formed "[u]sually from the jars and stuff that it's made in." Sergeant Nesbitt stated that once the cookie is made "[f]rom that it's cut up to either halves or quarters or either sold as a cookie and then it goes down to the [$]10, 20-dollar rocks." Sergeant Nesbitt agreed that the mid-level drug dealer would not have any manufacturing and packaging material "if he's already buying it premade." Sergeant Nesbitt agreed that the crack cocaine found in the residence was consistent with what a mid-level dealer might have in his possession. According to Sergeant Nesbitt, the larger pieces of the crack cocaine would be divided into smaller pieces worth five dollars to one hundred dollars "depending on the user that goes to purchase." Sergeant Nesbitt explained that the crack could be broken with fingernails or thumbnails, "anything like that." Sergeant Nesbitt testified that the two pieces of crack cocaine found in the residence could not be

5

smoked in a crack pipe and would have to be "broken down" if one wanted to smoke them. In other words, the pieces of crack cocaine found were not "in user form."

Sergeant Nesbitt testified that he conducted surveillance of Johnson before the warrant to search the residence was issued. During the surveillance, Sergeant Nesbitt observed "people come to the house, stay there for a minute or two, or maybe sometimes a little longer, and then get back out and leave." When asked if he saw "very many people do that," Sergeant Nesbitt replied, "Yes, sir." Sergeant Nesbitt acknowledged that he did not know what these people were doing at the residence; however, he stated that based on his experience he grew suspicious of the activity. Sergeant Nesbitt said that based on the fact that so many people were "in and out so fast," he believed that narcotic deals were occurring.

Sergeant Nesbitt stated that the amount of crack cocaine found in the residence was worth approximately "anywhere from [$]150 to $200." Therefore, 1.3 grams could be broken down into twenty rocks and sold for $10 per rock. Sergeant Nesbitt agreed that he had "dealt with some of the crack heads" in Matagorda County and Bay City. Sergeant Nesbitt stated that he saw some of the "crack heads" spend one or two minutes at Johnson's residence during his surveillance. Sergeant Nesbitt testified that he did not believe that a "crack head" would go to Johnson's residence and hide their "dope" at his house and then leave because a "crack head" would use the drug. In his experience, drug dealers usually hide their drugs so that it will not be stolen or found by the police. Sergeant Nesbitt did not have any reason to believe that the crack cocaine found in the residence belonged to anyone but Johnson.

6

Officer Theresa Mendoza, the "I.D. Officer" for the Matagorda County Sheriff's Office, testified that her job duties include processing crime scenes and maintaining care, custody, and control of all evidence or property that is received by the sheriff's office. This includes maintaining the evidence lockers at the sheriff's department. She explained that an officer who obtains evidence will deposit the evidence into an evidence locker and then Officer Mendoza locks the locker. No one except Officer Mendoza can access the evidence once it is in the locker because she is the only person who has a key to those lockers. If an officer requests that the evidence be sent to the lab for testing, Officer Mendoza packages it and then transports that evidence to the lab and drops it off for analysis. Officer Mendoza transports drugs to the Department of Public Safety's lab in Houston, Texas. The lab then analyzes the drugs and generates a report that is sent to Officer Mendoza's agency. Officer Mendoza keeps a copy of the report for her files and provides a copy to the investigating officer. Officer Mendoza then picks up the evidence from the lab.

Officer Mendoza testified that Deputy Brown submitted some evidence for testing in Johnson's case. Officer Mendoza testified that she transported the substance to the Department of Public Safety for analysis. The State offered State's exhibits 1, 2, and 6 into evidence. Defense counsel stated, "Your Honor, there will be no objections to [e]xhibits 1, 2, and 6." Officer Mendoza described exhibit 1 as the substance found in Johnson's residence, exhibit 2 as a report generated by the lab concerning the substance found, and exhibit 6 as the "book-in information" related to Johnson's case. The trial court admitted the three exhibits into evidence. Officer Mendoza testified that the lab report showed that State's exhibit 1 contained 1.30 grams of cocaine. Officer

7

Mendoza agreed that the "book-in sheet" showed that Johnson provided 2928 Avenue B as his address.

## II.    LEGAL SUFFICIENCY

By his first and second issues, Johnson contends that the evidence is legally and factually insufficient to prove that he possessed a controlled substance with the intent to deliver it.  Johnson argues that the State failed to establish beyond a reasonable doubt that he either knowingly possessed or knowingly intended to deliver the cocaine in an amount more than one gram but less than four grams.

### A.    Standard of Review and Applicable Law

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. Crim. App. 2010) (plurality op.). Accordingly, we review Johnson's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review.  *Id.* at 906-07, 912. Moreover, we do not refer separately to legal or factual sufficiency and will only analyze Johnson's issues under the *Jackson* standard.  *See id.* at 985 (concluding that there is no meaningful distinction between a legal and factual sufficiency analysis).

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (explaining that in the *Jackson* standard we consider "all of the evidence in the light most favorable to the verdict," and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The elements of the offense of possession of a controlled substance with the intent to deliver are that the defendant: (1) possessed a controlled substance in the amount alleged; (2) intended to deliver the controlled substance to another; and (3) knew that the substance in his possession was a controlled substance. *Figueroa v. State*, 250 S.W.3d 490, 500 (Tex. App.–Austin 2008, pet. ref'd).

**B.    Possession**

To prove unlawful possession, the State must have presented sufficient evidence that Johnson exercised control, management, or care over the substance and that he

9

knew the item possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). "Whether this evidence is direct or circumstantial, 'it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. This is the whole of the so-called 'affirmative links' rule.'" *Id.* at 405-06 (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). This rule has been established to protect an innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs. *Id.* at 406. In other words, a roommate, spouse, or relative may jointly possess a house but not necessarily possess the contraband. *Id.* Thus, "when the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Id.*

Texas courts have recognized as sufficient to establish a person's possession of contraband a non-exclusive list of possible "affirmative links," considered either singly or in combination.[5] *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006) (discussing "affirmative links," which is legal jargon for the large variety of circumstantial evidence that may establish a knowing possession of contraband); *Roberts v. State*, 321 S.W.3d 545, 549 (Tex. App.–Houston [14th Dist.] 2010, no pet.) ("[P]resence or

---

[5] The court of criminal appeals has considered, among other things, the following factors: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

proximity combined with other direct or circumstantial evidence (e.g. 'links') may be sufficient to establish the elements of possession beyond a reasonable doubt.").

> However, the affirmative link terminology does not constitute a unique legal rule, but is only a shorthand way of expressing what must be proven to establish that drugs were possessed knowingly or intentionally. Indeed, the number of linking factors present is not as important as the "logical force" they create to prove that the crime was committed.

*Roberson v. State*, 80 S.W.3d 730, 735 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd) (internal citations omitted).

Here, the State presented evidence that Johnson lived at 2928 Avenue B with his son.[6] Deputy Brown testified that he found Johnson's license and other paper work at the residence and that he determined this was Johnson's residence because he observed Johnson "coming and going from the residence, sitting on the porch of the residence, [and] playing basketball with the child outside of the residence." Furthermore, Johnson indicated on his "book-in sheet" that 2928 Avenue B was his address.

Deputy Brown testified that as a narcotics investigator, he often relies on confidential informants to purchase drugs from a drug dealer in order to acquire a search warrant of the premises. In those cases, Deputy Brown does not arrest the dealer for making the sale to the confidential informant, but merely uses that information to get the warrant. In this case, during his investigation of Johnson, Deputy Brown utilized a confidential informant to acquire the search warrant of Johnson's residence. Deputy Brown testified that the confidential informant made narcotics purchases at

---

[6] In his brief Johnson appears to assert that others were present when the search warrant was executed; however, Johnson points to no evidence in the record that anyone else was present in the residence when police searched it, and we find none. Moreover, both officers who were present during the search testified that Johnson was alone in the residence when they executed the warrant. No one else who was present during the search testified.

11

Johnson's residence. Based on this activity, Deputy Brown acquired a warrant to search the residence.

During the search, Deputy Brown found two pieces of crack cocaine in a hooded jacket hanging on the door of the only bedroom in the residence. Johnson was alone in the residence. When asked if he found "anything that suggested that the juvenile was involved" in the selling of the narcotics, Deputy Brown replied, "No." Deputy Brown agreed that all of the information he had and that his surveillance "reflected upon" Johnson.

On cross-examination, Deputy Brown stated that during his investigation using the confidential informant, "every time [they] went to [Johnson's] house there was narcotics at the house . . . basically from the informant standpoint." Deputy Brown also reiterated that Johnson was the only person living at that residence that he suspected had narcotics. Deputy Brown did not suspect that anyone else living at that residence had narcotics. Deputy Brown also acknowledged that he informed the magistrate before acquiring the warrant that there was "a lot of traffic coming in and out" of the residence.

Sergeant Nesbitt testified that during his surveillance of Johnson's residence, he saw a lot of "people come to the house, stay there for a minute or two, or maybe sometimes a little longer, and then get back out and leave." Based on this information and his training and experience, Sergeant Nesbitt believed that narcotic deals were being conducted at Johnson's residence. Sergeant Nesbitt testified that during his surveillance, he observed known "crack heads"—people who are addicted to crack cocaine—going to Johnson's residence and spending one or two minutes there.

12

Sergeant Nesbitt also stated that "crack heads" would not hide their drugs in Johnson's residence because a "crack head" would use the drugs. Sergeant Nesbitt stated that along with Deputy Brown's investigation and his surveillance, a warrant was issued to search Johnson's house. When asked if his investigation gave him any reason to believe that Johnson's son was involved in the drug transactions he observed, Sergeant Nesbitt stated, "No, sir." Sergeant Nesbitt also stated that based on his investigation and surveillance, he did not believe that anyone other than Johnson was involved in selling narcotics at this location.

In *Poindexter v. State*, the court of criminal appeals held that an out-of-court statement of a confidential informant that he bought drugs from appellant was sufficient to establish an affirmative link between appellant and the crack cocaine found in his home.[7] 153 S.W.3d at 409. Here, we have both Deputy Brown's and Sergeant Nesbitt's testimony that a confidential informant bought drugs from Johnson at his residence. *See id.* This factor alone is enough to link Johnson to the crack cocaine found in his residence. *See id.* Furthermore, the crack cocaine was accessible only to one who exercised control over the residence, and both officers testified that they did not believe Johnson's son—the only other person residing at the residence—was in any way connected to the drugs. *See id.* Next, the evidence showed that Johnson was the owner of the premises where the crack cocaine was found. *See id.* Further, because Johnson lived at the residence where the contraband was found, the contraband was certainly more accessible to him than to someone who did not reside there; and, again based on their investigations, both officers stated that Johnson's son was not involved

---

[7] In *Poindexter*, the appellant was not home when the officers found the drugs. 153 S.W.3d 402, 405 (Tex. Crim. App. 2005).

in the sale of drugs at this residence.  *See id.*  Thus, the State presented sufficient evidence that Johnson exercised control, management, or care over the substance found in his residence.  *See Poindexter*, 153 S.W.3d at 405.  Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that Johnson knowingly possessed the crack cocaine beyond a reasonable doubt."  *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898-99.  We overrule Johnson's first issue.

## C.    Intent to Deliver

Intent to deliver may be established by expert testimony, such as testimony from an experienced law enforcement officer, and circumstantial evidence.  *Moreno v. State*, 195 S.W.3d 321, 325-26 (Tex. App.–Houston [14th Dist.] 2006, pet. ref'd); *Ingram v. State*, 124 S.W.3d 672, 675 (Tex. App.–Eastland 2003, no pet.).  "Inferences can be made from the conduct of the defendant as well as the amount of the controlled substance possessed and the manner in which it was possessed."  *Ingram*, 124 S.W.3d at 675-76.  Some circumstantial factors to consider are:  "(1) the nature of the location at which the accused was arrested; (2) the quantity of contraband in the accused's possession; (3) the manner of packaging; (4) the presence or lack thereof of drug paraphernalia (for either use or sale); (5) the accused's possession of large amounts of cash; and (6) the accused's status as a drug user."  *Moreno*, 195 S.W.3d at 325-26; *Erskine v. State*, 191 S.W.3d 374, 380 (Tex. App.–Waco 2006, no pet.).  The number of factors present is not as important as the logical force the factors have in proving the elements of the offense.  *Moreno*, 195 S.W.3d at 326.  Intent is a question of fact that is determined by the trier of fact.  *Ingram*, 124 S.W.3d at 676.  "Intent can be inferred from

14

the acts, words, and conduct of the accused." *Moreno*, 195 S.W.3d at 326 (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)).

Here, Sergeant Nesbitt testified that he observed "crack heads" and other individuals go to Johnson's residence and stay for only one or two minutes and then leave. Deputy Brown testified that according to the confidential informant, every time they went to Johnson's residence, there were drugs. The evidence showed that a warrant was issued after the confidential informant purchased drugs at Johnson's residence, and both officers testified that, based on their investigations, Johnson's son was not involved in selling drugs.

Sergeant Nesbitt testified that a mid-level dealer will usually have crack cocaine in larger quantities for sales purposes, whereas users, "as soon as they get their hands on [the drugs], they're going to ingest it as soon as they can." The evidence showed that none of the tools necessary for ingesting crack cocaine were found in Johnson's residence, which according to Deputy Brown indicated that Johnson was not a user of the drug.

Sergeant Nesbitt stated that a factor he considered as showing that Johnson intended to deliver the cocaine was the quantity found. He stated, "That's not a quantity for a user. . . . I've never seen a crack pipe that you can put that type of—or that size of rock cocaine in." According to Sergeant Nesbitt, the quantity of crack cocaine found would need to be "broken down for the user," and it is "normal" for a mid-level dealer to break down a larger piece of crack cocaine in order to sell the smaller pieces usually for five, ten, or twenty dollars. Sergeant Nesbitt stated that it is also normal for mid-level

15

drug dealers to keep larger pieces of crack cocaine because they will wait to break off a piece of the crack cocaine until the user requests a certain amount.

Viewing the evidence in a light most favorable to the jury's verdict, we find that the evidence was sufficient for the jury to have determined beyond a reasonable doubt that Johnson possessed the crack cocaine with the intent to deliver. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898-99. We overrule Johnson's second issue.

### III.    MOTION TO SUPPRESS

By his third issue, Johnson contends that the trial court abused its discretion by denying his motion to suppress evidence—the crack cocaine. Specifically, Johnson argues that the affidavit submitted in support of the search warrant issued in this case did "not set forth facts sufficient to establish probable cause that (1) a specific offense has been committed, (2) specifically described property or items to be searched for and seized constitute evidence of the offense, and (3) the property or items constituting such evidence are located at the particular place to be searched."

It is well-settled that when a pre-trial motion to suppress evidence is overruled, the defendant is not required to subsequently object at trial to the same evidence in order to preserve error on appeal. *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986); *Thomas v. State*, 312 S.W.3d 732, 736 (Tex. App.–Houston [1st Dist.] 2009, pet. ref'd); *Adams v. State*, 180 S.W.3d 386, 406 n.29 (Tex. App.–Corpus Christi 2005, no pet.) (citing *Wilson v. State*, 857 S.W.2d 90, 93 (Tex. App.–Corpus Christi 1993, pet. denied)). "However, when the defendant affirmatively asserts during trial that he has 'no objection' to the admission of the complained of evidence, he waives any

16

error in the admission of the evidence despite the pre-trial ruling." *Moraguez*, 701 S.W.2d at 904; *Thomas*, 312 S.W.3d at 736; *Adams*, 180 S.W.3d at 406 n.29.

Here, the record reflects that Johnson obtained an adverse ruling on his pretrial motion to suppress the crack cocaine. However, when the State offered the offending evidence during trial, Johnson's trial counsel stated, "There will be no objections to [the State's exhibits, including the crack cocaine]." Because Johnson affirmatively asserted that he had no objection to the offending evidence, he has waived any error in the admission of the evidence despite the pre-trial ruling. *See Moraguez*, 701 S.W.2d at 904; *Thomas*, 312 S.W.3d at 736; *Adams*, 180 S.W.3d at 406 n.29. Accordingly, we overrule Johnson's third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

 

 

ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
2nd day of June, 2011.