NUMBER 13-10-00138-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS CHRISTI -
EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MELVIN JOHNSON III,                                                                  Appellant,

 

v.

 

THE STATE OF TEXAS,                                                                
Appellee.

 

 



On appeal from the 130th District
Court

of Matagorda County, Texas.

 

 



 MEMORANDUM OPINION

 

Before Chief Justice Valdez and
Justices Rodriguez and Benavides

Memorandum Opinion by Chief Justice
Valdez

            Appellant, Melvin Johnson III, was
convicted of possession of a controlled substance with intent to deliver.  See
Tex. Health & Safety Code Ann.
§ 481.112 (West 2010).  Johnson received a punishment of sixty years’
imprisonment and a $10,000 fine.[1] 
By three issues, Johnson contends that:  (1) the evidence was legally and
factually insufficient to prove that he possessed a controlled substance with
the intent to deliver it; and (2) the trial court abused its discretion in
denying his motion to suppress evidence.  We affirm.

I.          Background[2]

            Deputy Jeremy Brown of the Matagorda
County Sheriff’s Department testified that he conducted an investigation of
Johnson using confidential informants.  Deputy Brown stated that during the
course of his investigation, he identified 2928 Avenue B as Johnson’s
residence.  Deputy Brown observed Johnson “coming and going from the residence,
sitting on the porch of the residence, [and] playing basketball with the child
outside of the residence.”[3] 
Deputy Brown stated that during the course of a search, they usually look for
items such as utility bills, a driver’s license, or anything with identifying
information inside the residence.  In this case, Deputy Brown testified that after
acquiring a search warrant and searching 2928 Avenue B, the police found Johnson’s
driver’s license and “some scattered paperwork in the back room with the name
of Mr. Johnson on it.”

            According to Deputy Brown, during the
course of the investigation, the confidential informant purchased narcotics at
Johnson’s residence, and based on that information, Deputy Brown obtained a
warrant to search Johnson’s residence for narcotics.  Deputy Brown testified
that a SWAT team was used to effectuate the search warrant.  Deputy Brown
stated that the role of the SWAT team was to make entry into the house and to
secure the residence from any potential threats.  Deputy Brown assisted the
SWAT team “with the control outside . . . the house.”  Deputy
Brown testified that Johnson was present in the residence when entry was made
and that no one else was present inside the residence.  Johnson’s son was
outside playing basketball when the team made entry into the residence.

After the residence was
secure, Deputy Brown executed the search warrant.  According to Deputy Brown,
the police found “some crack cocaine in the pocket of a jacket that was hanging
on a door separating the living room from the bedroom.”[4]  Deputy Brown
stated that the crack cocaine was “in the front pocket of the jacket where your
hands go.”  Deputy Brown explained that there were two “rocks” of crack cocaine
that were “loose,” meaning that the pieces were not in any type of packaging. 
Deputy Brown documented that the crack cocaine weighed over one gram and less
than four grams.

Deputy Brown testified
that in cases of possession of crack cocaine, as opposed to cases of intent to
deliver, the police usually find paraphernalia that is used to ingest the
drugs, such as a crack pipe made of glass or a type of metal, brillo steel wool,
and needles.  Deputy Brown stated that he has also observed that in cases of
possession with intent to deliver, the police find larger amounts of the drug. 
Deputy Brown stated, “A user in my past—as a user, as soon as they get their
hands on [the drug], they’re going to ingest it as soon as they can.  There’s
not going to be amounts of crack cocaine throughout the residence.”

According to Deputy
Brown, to make crack, powder cocaine is “cooked down into a rock form” which is
usually “a round circle” called a “cookie” that reminded Deputy Brown of a
sugar cookie.  This cookie is then “broke[n] down into denominations to what
it’s going to be sold to the potential buyers.”  Deputy Brown stated that users
will have small amounts of the drug while dealers have larger quantities and
the amounts sold by drug dealers are “[a]nywhere from $5 to, you know [$]50, a
hundred.  You know around here, we see a lot of 10-and 20-dollar amounts
sold.”  Deputy Brown testified that a 20-dollar amount of crack cocaine is
“just a real small, small quantity, small rock for $20.  Definitely less than a
gram.”  Deputy Brown agreed that crack cocaine would not be sold in the amount
found in the residence and that amount would have to be “broken down” into
smaller pieces.  According to Deputy Brown, the amount of crack cocaine found
in the residence was valued “[b]etween [$]150 and $200 worth of crack.”  On
cross-examination, Deputy Brown explained Johnson’s intent to deliver the crack
cocaine was shown by the amount of the drug that was found in his residence,
among other things.  Deputy Johnson stated, “That’s not a quantity for a
user. . . .  I’ve never seen a crack pipe that you can
put that type of—or that size of rock cocaine in.”

According to Deputy
Brown, they did not find any drug paraphernalia, such as brillo, a pipe,
tubing, or needles.   When asked if he found “anything that suggested to [him]
that cocaine was being used in that residence,” Deputy Brown replied, “no,
ma’am.”  Deputy Brown acknowledged that they did not find any money, packaging,
or scales during the search.  However, Deputy Brown explained that it is “very
common” for crack to be sold without any packaging and usually crack cocaine in
this amount is sold by size and not by weight.  When asked if someone could
sell crack cocaine without scales, cooking implements, or packaging, Deputy
Brown responded, “Oh, yes, ma’am.”

Sergeant James Nesbitt of
the Matagorda County Sheriff’s Narcotics Division testified that “mid[-]level
dealer[s]” are not usually manufacturers of crack cocaine—they are not involved
in “cooking the dope.”  Instead, the mid-level dealers purchase the crack
cocaine from someone else who may have manufactured the drug.  These
manufacturers are also considered drug dealers.  According to Sergeant Nesbitt,
powder cocaine is cooked into “a circle of crack” called a “cookie.”  The
cookie is formed “[u]sually from the jars and stuff that it’s made in.” 
Sergeant Nesbitt stated that once the cookie is made “[f]rom that it’s cut up
to either halves or quarters or either sold as a cookie and then it goes down
to the [$]10, 20-dollar rocks.”  Sergeant Nesbitt agreed that the mid-level
drug dealer would not have any manufacturing and packaging material “if he’s
already buying it premade.”  Sergeant Nesbitt agreed that the crack cocaine
found in the residence was consistent with what a mid-level dealer might have
in his possession.  According to Sergeant Nesbitt, the larger pieces of the
crack cocaine would be divided into smaller pieces worth five dollars to one
hundred dollars “depending on the user that goes to purchase.”  Sergeant
Nesbitt explained that the crack could be broken with fingernails or
thumbnails, “anything like that.”  Sergeant Nesbitt testified that the two
pieces of crack cocaine found in the residence could not be smoked in a crack
pipe and would have to be “broken down” if one wanted to smoke them.  In other
words, the pieces of crack cocaine found were not “in user form.”

Sergeant Nesbitt testified
that he conducted surveillance of Johnson before the warrant to search the
residence was issued.  During the surveillance, Sergeant Nesbitt observed
“people come to the house, stay there for a minute or two, or maybe sometimes a
little longer, and then get back out and leave.”  When asked if he saw “very
many people do that,” Sergeant Nesbitt replied, “Yes, sir.”  Sergeant Nesbitt
acknowledged that he did not know what these people were doing at the
residence; however, he stated that based on his experience he grew suspicious
of the activity.  Sergeant Nesbitt said that based on the fact that so many
people were “in and out so fast,” he believed that narcotic deals were
occurring.

Sergeant Nesbitt stated
that the amount of crack cocaine found in the residence was worth approximately
“anywhere from [$]150 to $200.”  Therefore, 1.3 grams could be broken down into
twenty rocks and sold for $10 per rock.  Sergeant Nesbitt agreed that he had
“dealt with some of the crack heads” in Matagorda County and Bay City. 
Sergeant Nesbitt stated that he saw some of the “crack heads” spend one or two
minutes at Johnson’s residence during his surveillance.  Sergeant Nesbitt
testified that he did not believe that a “crack head” would go to Johnson’s
residence and hide their “dope” at his house and then leave because a “crack
head” would use the drug.  In his experience, drug dealers usually hide their
drugs so that it will not be stolen or found by the police.  Sergeant Nesbitt
did not have any reason to believe that the crack cocaine found in the
residence belonged to anyone but Johnson.

Officer Theresa Mendoza,
the “I.D. Officer” for the Matagorda County Sheriff’s Office, testified that
her job duties include processing crime scenes and maintaining care, custody,
and control of all evidence or property that is received by the sheriff’s
office.  This includes maintaining the evidence lockers at the sheriff’s
department.  She explained that an officer who obtains evidence will deposit
the evidence into an evidence locker and then Officer Mendoza locks the
locker.  No one except Officer Mendoza can access the evidence once it is in
the locker because she is the only person who has a key to those lockers.  If
an officer requests that the evidence be sent to the lab for testing, Officer
Mendoza packages it and then transports that evidence to the lab and drops it
off for analysis.  Officer Mendoza transports drugs to the Department of Public
Safety’s lab in Houston, Texas.  The lab then analyzes the drugs and generates
a report that is sent to Officer Mendoza’s agency.  Officer Mendoza keeps a
copy of the report for her files and provides a copy to the investigating
officer.  Officer Mendoza then picks up the evidence from the lab.

Officer Mendoza testified
that Deputy Brown submitted some evidence for testing in Johnson’s case. 
Officer Mendoza testified that she transported the substance to the Department
of Public Safety for analysis.  The State offered State’s exhibits 1, 2, and 6
into evidence.  Defense counsel stated, “Your Honor, there will be no
objections to [e]xhibits 1, 2, and 6.”  Officer Mendoza described exhibit 1 as
the substance found in Johnson’s residence, exhibit 2 as a report generated by
the lab concerning the substance found, and exhibit 6 as the “book-in
information” related to Johnson’s case.  The trial court admitted the three
exhibits into evidence.  Officer Mendoza testified that the lab report showed
that State’s exhibit 1 contained 1.30 grams of cocaine.  Officer Mendoza agreed
that the “book-in sheet” showed that Johnson provided 2928 Avenue B as his
address.

II.         Legal Sufficiency

            By his first and second issues,
Johnson contends that the evidence is legally and factually insufficient to
prove that he possessed a controlled substance with the intent to deliver it. 
Johnson argues that the State failed to establish beyond a reasonable doubt
that he either knowingly possessed or knowingly intended to deliver the cocaine
in an amount more than one gram but less than four grams.

A.        Standard of Review and Applicable Law

The court of criminal appeals has held that there
is “no meaningful distinction between the Jackson v. Virginia legal
sufficiency standard and the Clewis factual-sufficiency standard” and
that the Jackson standard “is the only standard that a reviewing court
should apply in determining whether the evidence is sufficient to support each
element of a criminal offense that the State is required to prove beyond a
reasonable doubt.”  Brooks v. State, 323 S.W.3d 893, 902-03, 912 (Tex.
Crim. App. 2010) (plurality op.).  Accordingly, we review Johnson’s claims of
evidentiary sufficiency under “a rigorous and proper application” of the Jackson
standard of review.  Id. at 906-07, 912.  Moreover, we do not refer
separately to legal or factual sufficiency and will only analyze Johnson’s
issues under the Jackson standard.  See id. at 985 (concluding
that there is no meaningful distinction between a legal and factual sufficiency
analysis).

Under the Jackson
standard, “the relevant question is whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.”  Jackson
v. Virginia, 443 U.S. 307, 319 (1979); see Brooks, 323 S.W.3d at
898-99 (explaining that in the Jackson standard we consider “all of the
evidence in the light most favorable to the verdict,” and determine whether the
jury was rationally justified in finding guilt beyond a reasonable doubt).  “[T]he
fact[-]finder's role as weigher of the evidence is preserved through a legal
conclusion that upon judicial review all of the evidence is to be
considered in the light most favorable to the prosecution.”  Jackson,
443 U.S. at 319 (emphasis in original); see also Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979) (“The jury,
in all cases is the exclusive judge of facts proved and the weight to be given
to the testimony . . . .”); Wesbrook v. State, 29 S.W.3d 103, 111 (Tex.
Crim. App. 2000) (“The jury is the exclusive judge of the credibility of
witnesses and of the weight to be given testimony, and it is also the exclusive
province of the jury to reconcile conflicts in the evidence.”).

We measure the legal
sufficiency of the evidence by the elements of the offense as defined by a
hypothetically correct jury charge.  Coleman v. State, 131 S.W.3d 303,
314 (Tex. App.–Corpus Christi 2004, pet. ref’d) (citing Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  The elements of the offense of
possession of a controlled substance with the intent to deliver are that the
defendant:  (1) possessed a controlled substance in the amount alleged; (2)
intended to deliver the controlled substance to another; and (3) knew that the
substance in his possession was a controlled substance.  Figueroa v. State,
250 S.W.3d 490, 500 (Tex. App.–Austin 2008, pet. ref’d).

B.        Possession

            To prove unlawful possession, the
State must have presented sufficient evidence that Johnson exercised control,
management, or care over the substance and that he knew the item possessed was
contraband.  Poindexter v. State, 153 S.W.3d 402, 405 (Tex. Crim. App.
2005).  “Whether this evidence is direct or circumstantial, ‘it must establish,
to the requisite level of confidence, that the accused’s connection with the
drug was more than just fortuitous.  This is the whole of the so-called ‘affirmative
links’ rule.’”  Id. at 405-06 (quoting Brown v. State, 911 S.W.2d
744, 747 (Tex. Crim. App. 1995)).  This rule has been established to protect an
innocent bystander from conviction based solely upon his fortuitous proximity
to someone else’s drugs.  Id. at 406.  In other words, a roommate,
spouse, or relative may jointly possess a house but not necessarily possess the
contraband.  Id.  Thus, “when the accused is not in exclusive possession
of the place where the substance is found, it cannot be concluded that the accused
had knowledge of and control over the contraband unless there are additional
independent facts and circumstances which affirmatively link the accused to the
contraband.”  Id.

            Texas courts have recognized as
sufficient to establish a person’s possession of contraband a non-exclusive
list of possible “affirmative links,” considered either singly or in
combination.[5] 
Evans v. State, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006)
(discussing “affirmative links,” which is legal jargon for the large variety of
circumstantial evidence that may establish a knowing possession of contraband);
Roberts v. State, 321 S.W.3d 545, 549 (Tex. App.–Houston [14th Dist.]
2010, no pet.) (“[P]resence or proximity combined with other direct or
circumstantial evidence (e.g. ‘links’) may be sufficient to establish the
elements of possession beyond a reasonable doubt.”).

However,
the affirmative link terminology does not constitute a unique legal rule, but
is only a shorthand way of expressing what must be proven to establish that
drugs were possessed knowingly or intentionally.  Indeed, the number of linking
factors present is not as important as the “logical force” they create to prove
that the crime was committed.

 

Roberson v. State, 80 S.W.3d 730, 735 (Tex.
App.–Houston [1st Dist.] 2002, pet. ref’d) (internal citations omitted).

            Here, the State presented evidence
that Johnson lived at 2928 Avenue B with his son.[6]  Deputy Brown
testified that he found Johnson’s license and other paper work at the residence
and that he determined this was Johnson’s residence because he observed Johnson
“coming and going from the residence, sitting on the porch of the residence,
[and] playing basketball with the child outside of the residence.”  Furthermore,
Johnson indicated on his “book-in sheet” that 2928 Avenue B was his address.

            Deputy Brown testified that as a
narcotics investigator, he often relies on confidential informants to purchase
drugs from a drug dealer in order to acquire a search warrant of the premises. 
In those cases, Deputy Brown does not arrest the dealer for making the sale to
the confidential informant, but merely uses that information to get the
warrant.  In this case, during his investigation of Johnson, Deputy Brown
utilized a confidential informant to acquire the search warrant of Johnson’s
residence.  Deputy Brown testified that the confidential informant made
narcotics purchases at Johnson’s residence.  Based on this activity, Deputy
Brown acquired a warrant to search the residence.

During the search, Deputy
Brown found two pieces of crack cocaine in a hooded jacket hanging on the door
of the only bedroom in the residence.  Johnson was alone in the residence. 
When asked if he found “anything that suggested that the juvenile was involved”
in the selling of the narcotics, Deputy Brown replied, “No.”  Deputy Brown
agreed that all of the information he had and that his surveillance “reflected
upon” Johnson.

On cross-examination,
Deputy Brown stated that during his investigation using the confidential
informant, “every time [they] went to [Johnson’s] house there was narcotics at
the house . . . basically from the informant standpoint.” 
Deputy Brown also reiterated that Johnson was the only person living at that
residence that he suspected had narcotics.  Deputy Brown did not suspect that
anyone else living at that residence had narcotics.  Deputy Brown also
acknowledged that he informed the magistrate before acquiring the warrant that
there was “a lot of traffic coming in and out” of the residence.

Sergeant Nesbitt
testified that during his surveillance of Johnson’s residence, he saw a lot of
“people come to the house, stay there for a minute or two, or maybe sometimes a
little longer, and then get back out and leave.”  Based on this information and
his training and experience, Sergeant Nesbitt believed that narcotic deals were
being conducted at Johnson’s residence.  Sergeant Nesbitt testified that during
his surveillance, he observed known “crack heads”—people who are addicted to
crack cocaine—going to Johnson’s residence and spending one or two minutes
there.  Sergeant Nesbitt also stated that “crack heads” would not hide their
drugs in Johnson’s residence because a “crack head” would use the drugs. 
Sergeant Nesbitt stated that along with Deputy Brown’s investigation and his
surveillance, a warrant was issued to search Johnson’s house.  When asked if
his investigation gave him any reason to believe that Johnson’s son was
involved in the drug transactions he observed, Sergeant Nesbitt stated, “No,
sir.”  Sergeant Nesbitt also stated that based on his investigation and
surveillance, he did not believe that anyone other than Johnson was involved in
selling narcotics at this location.

In Poindexter v. State,
the court of criminal appeals held that an out-of-court statement of a
confidential informant that he bought drugs from appellant was sufficient to
establish an affirmative link between appellant and the crack cocaine found in
his home.[7] 
153 S.W.3d at 409.  Here, we have both Deputy Brown’s and Sergeant Nesbitt’s
testimony that a confidential informant bought drugs from Johnson at his
residence.  See id.  This factor alone is enough to link Johnson to the
crack cocaine found in his residence.  See id.  Furthermore, the crack
cocaine was accessible only to one who exercised control over the residence,
and both officers testified that they did not believe Johnson’s son—the only
other person residing at the residence—was in any way connected to the drugs.  See
id.  Next, the evidence showed that Johnson was the owner of the premises
where the crack cocaine was found.  See id.  Further, because Johnson
lived at the residence where the contraband was found, the contraband was
certainly more accessible to him than to someone who did not reside there; and,
again based on their investigations, both officers stated that Johnson’s son
was not involved in the sale of drugs at this residence.  See id.  Thus,
the State presented sufficient evidence that Johnson exercised control,
management, or care over the substance found in his residence.  See
Poindexter, 153 S.W.3d at 405.  Viewing the evidence in the light most
favorable to the prosecution, we conclude that a rational trier of fact could
have found that Johnson knowingly possessed the crack cocaine beyond a
reasonable doubt.”  See Jackson, 443 U.S. at 319; Brooks, 323
S.W.3d at 898-99.  We overrule Johnson’s first issue.

C.        Intent to Deliver

            Intent to deliver may be established
by expert testimony, such as testimony from an experienced law enforcement
officer, and circumstantial evidence.  Moreno v. State, 195 S.W.3d 321,
325-26 (Tex. App.–Houston [14th Dist.] 2006, pet. ref’d); Ingram v. State,
124 S.W.3d 672, 675 (Tex. App.–Eastland 2003, no pet.).  “Inferences can be
made from the conduct of the defendant as well as the amount of the controlled
substance possessed and the manner in which it was possessed.”  Ingram,
124 S.W.3d at 675-76.  Some circumstantial factors to consider are:  “(1) the
nature of the location at which the accused was arrested; (2) the quantity of
contraband in the accused’s possession; (3) the manner of packaging; (4) the
presence or lack thereof of drug paraphernalia (for either use or sale); (5)
the accused’s possession of large amounts of cash; and (6) the accused’s status
as a drug user.” Moreno, 195 S.W.3d at 325-26; Erskine v. State,
191 S.W.3d 374, 380 (Tex. App.–Waco 2006, no pet.).  The number of factors
present is not as important as the logical force the factors have in proving
the elements of the offense.  Moreno, 195 S.W.3d at 326.  Intent is a
question of fact that is determined by the trier of fact.  Ingram, 124
S.W.3d at 676.  “Intent can be inferred from the acts, words, and conduct of
the accused.”  Moreno, 195 S.W.3d at 326 (citing Patrick v. State,
906 S.W.2d 481, 487 (Tex. Crim. App. 1995)).

            Here, Sergeant Nesbitt testified that
he observed “crack heads” and other individuals go to Johnson’s residence and
stay for only one or two minutes and then leave.  Deputy Brown testified that
according to the confidential informant, every time they went to Johnson’s
residence, there were drugs.  The evidence showed that a warrant was issued
after the confidential informant purchased drugs at Johnson’s residence, and
both officers testified that, based on their investigations, Johnson’s son was
not involved in selling drugs.

            Sergeant Nesbitt testified that a
mid-level dealer will usually have crack cocaine in larger quantities for sales
purposes, whereas users, “as soon as they get their hands on [the drugs],
they’re going to ingest it as soon as they can.”  The evidence showed that none
of the tools necessary for ingesting crack cocaine were found in Johnson’s
residence, which according to Deputy Brown indicated that Johnson was not a
user of the drug.

Sergeant Nesbitt stated
that a factor he considered as showing that Johnson intended to deliver the
cocaine was the quantity found.  He stated, “That’s not a quantity for a
user. . . .  I’ve never seen a crack pipe that you can
put that type of—or that size of rock cocaine in.”  According to Sergeant
Nesbitt, the quantity of crack cocaine found would need to be “broken down for
the user,” and it is “normal” for a mid-level dealer to break down a larger piece
of crack cocaine in order to sell the smaller pieces usually for five, ten, or
twenty dollars.  Sergeant Nesbitt stated that it is also normal for mid-level
drug dealers to keep larger pieces of crack cocaine because they will wait to
break off a piece of the crack cocaine until the user requests a certain
amount.

Viewing the evidence in a
light most favorable to the jury's verdict, we find that the evidence was
sufficient for the jury to have determined beyond a reasonable doubt that Johnson
possessed the crack cocaine with the intent to deliver.  See Jackson,
443 U.S. at 319; Brooks, 323 S.W.3d at 898-99.  We overrule Johnson’s
second issue.

III.        Motion to Suppress

            By his third issue, Johnson contends
that the trial court abused its discretion by denying his motion to suppress
evidence—the crack cocaine.  Specifically, Johnson argues that the affidavit
submitted in support of the search warrant issued in this case did “not set
forth facts sufficient to establish probable cause that (1) a specific offense
has been committed, (2) specifically described property or items to be searched
for and seized constitute evidence of the offense, and (3) the property or
items constituting such evidence are located at the particular place to be
searched.”

            It is well-settled that when a
pre-trial motion to suppress evidence is overruled, the defendant is not
required to subsequently object at trial to the same evidence in order to
preserve error on appeal.  Moraguez v. State, 701 S.W.2d 902, 904 (Tex.
Crim. App. 1986); Thomas v. State, 312 S.W.3d 732, 736 (Tex. App.–Houston
[1st Dist.] 2009, pet. ref’d); Adams v. State, 180 S.W.3d 386, 406 n.29
(Tex. App.–Corpus Christi 2005, no pet.) (citing Wilson v. State, 857
S.W.2d 90, 93 (Tex. App.–Corpus Christi 1993, pet. denied)).  “However, when
the defendant affirmatively asserts during trial that he has ‘no objection’ to
the admission of the complained of evidence, he waives any error in the
admission of the evidence despite the pre-trial ruling.”  Moraguez, 701
S.W.2d at 904; Thomas, 312 S.W.3d at 736; Adams, 180 S.W.3d at
406 n.29.

            Here, the record reflects that Johnson
obtained an adverse ruling on his pretrial motion to suppress the crack
cocaine.  However, when the State offered the offending evidence during trial,
Johnson’s trial counsel stated, “There will be no objections to [the State’s
exhibits, including the crack cocaine].”  Because Johnson affirmatively
asserted that he had no objection to the offending evidence, he has waived any
error in the admission of the evidence despite the pre-trial ruling.  See
Moraguez, 701 S.W.2d at 904; Thomas, 312 S.W.3d at 736; Adams,
180 S.W.3d at 406 n.29.  Accordingly, we overrule Johnson’s third issue.

IV.       Conclusion

            We affirm the trial court’s judgment.

____________________

Rogelio Valdez

                                                                                                Chief
Justice

 

Do not
Publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the


2nd day of June, 2011.

 

 









[1]
After finding Johnson guilty of the offense, the jury found that Johnson was a
repeat offender.  See Tex. Penal
Code Ann. § 12.42 (West Supp. 2010).





[2]
We note that the record reflects that Johnson “refused” to sign the trial
court’s certification of defendant’s right of appeal.  Pursuant to rule
25.2(d), the trial court’s certification “shall include notice that the
defendant has been informed of his rights concerning an appeal, as well as any
right to file a pro se petition for discretionary review.”  See Tex. R. App. P. 25.2(d).  Although the
certification shows that Johnson refused to sign it, the record reflects that
Johnson was notified of his rights under rule 25.2(d).  The record also
contains a letter from Johnson’s trial counsel stating that he explained those
rights to Johnson.  Moreover, Johnson filed a timely notice of appeal, and both
Johnson and the State have filed briefs in this case.  Therefore, we conclude
that rule 25.2(d)’s requirements have been met in this case.





[3]
Deputy Brown testified that based on his investigation, Johnson lived at the
residence with “a younger child.”





[4]
Deputy Brown described the residence as as follows:  “It was a wood frame, one
bedroom.  Basically, had a bedroom, bathroom, living room, and kitchen.  That
was basically it.”





[5]
The court of criminal appeals has considered, among other things, the following
factors:  (1) the defendant's presence when a search is conducted; (2) whether
the contraband was in plain view; (3) the defendant's proximity to and the
accessibility of the narcotic; (4) whether the defendant was under the
influence of narcotics when arrested; (5) whether the defendant possessed other
contraband or narcotics when arrested; (6) whether the defendant made
incriminating statements when arrested; (7) whether the defendant attempted to
flee; (8) whether the defendant made furtive gestures; (9) whether there was an
odor of contraband; (10) whether other contraband or drug paraphernalia were
present; (11) whether the defendant owned or had the right to possess the place
where the drugs were found; (12) whether the place where the drugs were found
was enclosed; (13) whether the defendant was found with a large amount of cash;
and (14) whether the conduct of the defendant indicated a consciousness of
guilt.  Evans v. State, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).





[6]
In his brief Johnson appears to assert that others were present when the search
warrant was executed; however, Johnson points to no evidence in the record that
anyone else was present in the residence when police searched it, and we find
none.  Moreover, both officers who were present during the search testified
that Johnson was alone in the residence when they executed the warrant.  No one
else who was present during the search testified.





[7]
In Poindexter, the appellant was not home when the officers found the
drugs.  153 S.W.3d 402, 405 (Tex. Crim. App. 2005).